[No. S005275. June 26, 1989.]

In re FELIPE EVANGELISTA SIXTO on Habeas Corpus.

COUNSEL

Louis S. Katz and Judith C. Rosen for Petitioner.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Joel Carey, Robert R. Anderson and Anthony L. Dicce, Deputy Attorneys General, for Respondent.

OPINION

PANELLI, J.—Petitioner Felipe Evangelista Sixto seeks a writ of habeas corpus following his conviction of first degree murder and related charges and judgment of sentence of death. His petition was filed in conjunction with his automatic appeal, which is pending. Because the claims raised herein appeared dispositive, we have proceeded with the habeas petition before hearing the appeal.

Petitioner claims that he was denied the effective assistance of counsel in a number of respects. Of the seven instances of alleged deficiency, we issued an order to show cause on three: the failure to investigate petitioner's blood-alcohol level, the failure to adequately investigate the defense of diminished capacity based on PCP intoxication, and the failure to adequately investigate available evidence of petitioner's good character for the penalty phase. The Attorney General filed a return which does not dispute the material facts alleged by petitioner, but which challenges the claimed prejudice flowing from the cited deficiencies.

 In a habeas corpus proceeding the return to the order to show cause must allege facts tending to establish the legality of the petitioner's detention; it is thus analogous to the complaint in civil actions. The traverse, which may incorporate the allegations of the petition, is analogous to the answer in civil actions. (*In re Lewallen* (1979) 23 Cal.3d 274, 277 [152 Cal.Rptr. 528, 590 P.2d 383, 100 A.L.R.3d 823]; *In re Saunders* (1970) 2 Cal.3d 1033, 1047 [88 Cal.Rptr. 633, 472 P.2d 921].) It is in this manner that the factual and legal issues are joined for review. (*In re Lewallen, supra,* 23 Cal.3d at p. 278.) When the return effectively admits the material factual allegations of the petition and traverse by not disputing them, we may resolve the issue without ordering an evidentiary hearing. (See *People* v. *Frierson* (1979) 25 Cal.3d 142, 160 [158 Cal.Rptr. 281, 599 P.2d 587]; *In re Lewallen, supra,* 23 Cal.3d at p. 278; *In re Saunders, supra,* 2 Cal.3d at p. 1048.)

In the present case, since the return has not disputed petitioner's material factual allegations, we may resolve the issues joined by the pleadings without an evidentiary hearing. In so doing, we conclude that petitioner has established entitlement to relief for ineffectiveness of counsel at the guilt phase of his trial. Accordingly, we reverse petitioner's convictions.

Petitioner, who was 25 years old at the time of trial, is an illiterate Spanish-speaking farm worker whose only previous arrest was an immigration detention. He was convicted of the first degree murder (Pen. Code, § 187) of five-year-old Jorge Garza, as well as sodomy (Pen. Code, § 286, subd. (c)) and lewd and lascivious conduct (Pen. Code, § 288) on him.[1] Two special circumstances were found true: the murder was committed while engaged in the commission or attempted commission of sodomy (§ 190.2, subd. (a)(17)(iv)), and the murder was committed while engaged in the commission or attempted commission of a lewd or lascivious act upon a child under the age of fourteen (§ 190.2, subd. (a)(17)(v)).

### Guilt Trial

On June 6, 1981, petitioner and several other farm workers went to a barbecue at the Garza home on Judith Street in Arvin, a community near Bakersfield. Petitioner lived next door to the Garza home with his mother, her common-law husband, and his two younger brothers. Petitioner had worked in the morning and spent the afternoon and evening at the barbecue

---

[1] Unless otherwise noted, all statutory references hereafter are to the Penal Code.

eating and drinking beer. A substantial amount of beer and food was consumed.

Jorge Garza came in and out of the party several times since it was at his grandfather's house. Petitioner left the party about 10 to 15 minutes after Jorge was last seen and was gone for an estimated 20 to 45 minutes. Shortly after 8:30 p.m. when Jorge did not return, his parents and several neighbors searched the neighborhood and the adjoining grape vineyards.

Jorge's partially clothed body was found in the vineyard across the road from his home. Jorge was lying on his back, naked except for a jacket. There were abrasion marks on his groin, neck and chin.

Several partial but distinctive shoe tracks were near Jorge's pants, which were found several feet away from his body. There were also barefoot tracks in the vineyard. Around midnight Deputy Sheriff Medina saw a shoe print in a front yard on Judith Street similar to those found in the vineyard. Medina and other officers knocked on the door and found it was the residence of petitioner and his family. Petitioner's mother led the officers to the room where petitioner and his brothers were sleeping. Petitioner was sleeping in his clothes; shoes under his bed appeared to have the same tread as that seen in the vineyard.

The officers took petitioner to the station for questioning shortly after midnight; they arrested him early the next morning—June 7. Petitioner was interrogated separately by Deputy Sheriff Medina and Sheriff's Lieutenant Gutierrez on June 7. All interrogations were in Spanish since petitioner speaks only Spanish. Two of the interrogations were tape-recorded. Petitioner consented to having a blood sample taken, as well as saliva and penile swabs. Tests by Western Laboratories of the blood drawn from petitioner at 11:40 a.m., June 7, 1981, revealed no evidence of PCP or other drugs. The blood sample was never tested for alcohol.

Petitioner also consented to an examination of his clothes. Fecal stains were found on his pants. Sheriff's criminalists determined that petitioner was a type O secretor. Jorge's blood was type B, and he was also probably a secretor. A fecal stain on petitioner's pants was determined to be from a type B secretor. The criminalists determined that petitioner's shoes matched two shoe prints found in the vineyard. Criminalist Kyle fashioned his own test for comparing the barefoot prints with petitioner's and found they were substantially similar.

The coroner's pathologist, Dr. Comparini, testified that the cause of death was asphyxia as a result of manual strangulation. Jorge's anus was markedly dilated, with small abrasions and stretch marks inside, consistent with forceful penetration of the anus before death. Dr. Comparini also stated that a bruise on Jorge's penis reflected sexual manipulation of the penis.

At the close of the prosecution case, the court held a section 1368 competency trial. A separate jury found petitioner competent.

The defense presented testimony by petitioner's mother that he had been a "blue baby" at birth (insufficient oxygen) and had always been slow mentally. He had had only 13 days of schooling in his life. He had also had two falls as a child during which he lost consciousness. Three doctors testified in support of a diminished capacity defense.

Dr. Sanderson, a clinical psychologist and neuropsychologist, gave petitioner tests which indicated he had organic brain damage. During an examination in October 1981, petitioner told Dr. Sanderson that he had drunk beer and used marijuana at the party and that someone had surreptitiously poured a yellow powder in his beer while he was in the bathroom. Dr. Sanderson thought it likely that petitioner had an acute psychotic episode triggered by alcohol and/or drug intoxication causing him to be out of contact with reality and unable to recall the 45 minutes he was gone from the barbecue.

Dr. Thompson, a neurologist-psychiatrist, found evidence of scar tissue on petitioner's brain which predisposed him to an attack of acute pathologic alcoholic intoxication due to the heavy consumption of alcohol at the time of the offense. Petitioner told Dr. Thompson that he had drunk 20 beers, smoked marijuana, and that some people at the party had put PCP in his beer without his knowledge. After he had unknowingly drunk the PCP-laced beer, his head felt bad, and his body felt hot inside. Petitioner recalled walking into the vineyard with Jorge, playing with him, having his hand around the boy's neck when he heard the boy's mother call, and he recalled carrying the boy to the edge of the vineyard. Petitioner told Dr. Thompson that he had not wanted to hurt Jorge and that he thought it was the powder, the PCP, that made him do it if he did it. Petitioner stated he was charged with sodomy, but he did not remember doing such an act. Petitioner did not have any memory of doing anything of a sexual nature with Jorge. Dr. Thompson thought that petitioner had amnesia during the time the boy was killed and that it was due to psychomotor epilepsy precipitated by alcohol intoxication. He concluded that petitioner did not have the ability to form the specific intent to kill, to premeditate or deliberate, or to harbor malice.

Dr. Blinder, a psychiatrist, concluded that petitioner had probably suffered a psychotic episode precipitated by large amounts of alcohol and possibly other drugs. Petitioner said he had drunk about 24 cans of beer in about 7 hours on the day of the killing. Petitioner told Dr. Blinder he followed Jorge into the vineyard, but he recalled nothing else about Jorge until he was carrying him and heard Jorge's mother call. Petitioner carried Jorge to the edge of the vineyard and returned to the party. Petitioner told Dr. Blinder that someone had put a yellow powder in his beer. He said other people were using it. He went to the bathroom, came back, drank his beer, and then felt funny. Petitioner said he felt lightheaded, hot, feverish, and like his head was swelling. When Dr. Blinder was given the prosecution's lab report showing no evidence of PCP, he eliminated PCP as a cause, but he did not change his opinion about petitioner's mental state—that petitioner was significantly impaired and could not form intent.

Roberto Sixto, petitioner's brother, testified that the Garzas had offered petitioner marijuana at the party. Roberto was at his house, but he could smell marijuana from the party.

In rebuttal, the prosecution presented Dr. Burdick, a psychiatrist who had examined petitioner under court appointment regarding section 1026 (not guilty by reason of insanity). Dr. Burdick saw no evidence of psychosis and no present psychiatric disease. Petitioner told Dr. Burdick that he had begun drinking about noon on June 6, that he had had some marijuana, and was offered and refused some PCP. The people at the barbecue told him that someone had put PCP in his beer without his knowledge. About 30 minutes later petitioner's head was spinning, his vision was blurred, and he felt like he was floating. During his initial evaluation Dr. Burdick felt that if PCP consumption were substantiated, it might very well have contributed to a very significant alteration of petitioner's mental state. The lab report from Western Laboratories did not substantiate PCP usage.

Dr. Badgley also testified in rebuttal. He found petitioner to be in the normal range mentally and emotionally. Petitioner related the same events regarding drinking, smoking marijuana, and having powder put in his beer. Petitioner said they bought two more cases of beer during the party. Regarding his memory of the incident, petitioner remembered "his [Jorge's] mother calling him. It seems like she was close by. I had a strange feeling like they were calling me. I was choking him. I don't know why. We were in the middle of the rows. There are 90 vines in a row. Instead of hiding him where someone couldn't find him, I pulled him over to the edge and left him leaning against the vineyard where he could be found. I went home, felt strange like floating, could hear the voices of the people."

Detective Gutierrez was recalled by the prosecution and repeated his earlier testimony that petitioner had told him on June 7, 1981, that he had consumed six or seven beers and no other drugs. Deputy Medina also testified in rebuttal that he had asked petitioner about drugs, and petitioner did not mention PCP or marijuana.

The court instructed on first degree murder by premeditation and deliberation and first degree felony murder during the commission or attempted commission of lewd and lascivious conduct with a child. The court also instructed on second degree murder and voluntary and involuntary manslaughter. Instruction was given on voluntary intoxication, but defense counsel requested that no instruction be given on involuntary intoxication. The court also instructed that a person who commits a crime while unconscious is not guilty of a crime. As to petitioner's statements to the doctors, the court instructed that they were to be considered only for the limited purpose of showing the information upon which the medical expert based his opinion.

As previously stated, the jury found petitioner guilty of first degree murder with two felony-murder special circumstances (sodomy and lewd and lascivious conduct), sodomy, and lewd and lascivious conduct with a child.

### Penalty Trial

At the penalty trial the prosecution elected to present no new evidence. Defendant testified in his own defense. He had been to school only 13 days when he was 7, and he could not read or write. He went to work selling newspapers when he left school and gave the money to his mother. He still gives money to his mother and sends it to relatives in Mexico. Petitioner essentially repeated the statements he made to the doctors about his memory of the killing. Dr. Thompson again testified about petitioner's impaired mental state. He thought petitioner was highly intoxicated with alcohol and probably also with some PCP drug and that he was having some kind of seizure disorder known as psychomotor epilepsy. A sheriff's deputy testified that there had been no bad report on petitioner during the year and a half he had been in jail on these charges.

Petitioner's mother again testified as to his background. She said he had always lived with her, had always worked and given her his wages. He never got into fights. Petitioner's aunt and uncle, who lived in Mexico, testified that petitioner was a quiet and peaceful child who worked to support his mother and grandparents.

As previously stated, the jury fixed the punishment at death.

## Ineffectiveness of Counsel

Petitioner contends that his trial counsel rendered ineffective assistance under both the United States and California Constitutions for failure to investigate petitioner's blood-alcohol level, PCP usage, and mitigating evidence for the penalty trial. ■ To establish ineffectiveness of counsel under article I, section 15 of the California Constitution, petitioner must prove that counsel failed to make particular investigations and that the omissions resulted in the denial of or inadequate presentation of a potentially meritorious defense. (*People* v. *Williams* (1988) 44 Cal.3d 883, 936 [245 Cal.Rptr. 336, 751 P.2d 395].) In particular, petitioner must show that counsel knew or should have known that further investigation was necessary and must establish the nature and relevance of the evidence that counsel failed to present or discover. ■ When the evidence relates to a diminished capacity defense, the failure to discover or present the evidence will be considered prejudicial only if it might have caused a reasonable jury to conclude that the defendant actually lacked the mental capacity that constituted an element of the charged offense. (*Id*. at p. 937.) ■ Finally, it must also be shown that the omission was not attributable to a tactical decision which a reasonably competent, experienced criminal defense attorney would make. (*People* v. *Frierson, supra,* 25 Cal.3d 142, 158.)

■ The standards for measuring competence of counsel under the Sixth and Fourteenth Amendments are similar. Except in cases where counsel's performance was so deficient that a breakdown in the adversarial process occurred, actual prejudice must be shown. (*United States* v. *Cronic* (1984) 466 U.S. 648, 656-657 [80 L.Ed.2d 657, 666-667, 104 S.Ct. 2039].) The defendant must demonstrate that counsel's performance was deficient and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. (*Strickland* v. *Washington* (1984) 466 U.S. 668, 694 [80 L.Ed.2d 674, 697-698, 104 S.Ct. 2052].)

Before proceeding to the specific deficiencies alleged, it is important to note certain facts about petitioner's representation at trial. Unless otherwise indicated, these facts are all matters of record. Attorney Eugene Lorenz was petitioner's sole counsel from June 12, 1981, until May 6, 1982. At that time, less than two weeks before trial, attorney Robert Cook was appointed as cocounsel at Lorenz's request. When Lorenz inexplicably failed to appear in court on several days during the jury selection process, the court, on May 27, 1982, declared that Cook was lead counsel. When Lorenz reappeared and moved for a continuance or mistrial on June 2, 1982, based on his health and personal problems stemming from his then ongoing and

extremely difficult divorce, the court denied the motions but removed Cook from lead counsel status and made Cook and Lorenz cocounsel on an equal basis. After Lorenz continued to have personal problems resulting in his failure to appear at trial, the court, on July 7, 1982, reassigned Cook as lead counsel. It is not surprising then, that the record is replete with instances of lack of communication between Cook and Lorenz, which resulted in Cook's making decisions based on inadequate information.

In a declaration filed with the habeas petition, Cook states that he entered the case two weeks before trial on the understanding that he would be assisting Lorenz, who would be lead counsel. He and Lorenz had worked together before on a capital case and had gotten along well. Cook knew that Lorenz had been on the case for about a year and assumed that Lorenz, who was an experienced defense lawyer, had made all the necessary pretrial investigation and motions. Cook reluctantly agreed to be lead counsel after Lorenz began experiencing serious personal difficulties. Cook, who himself is a seasoned defense attorney, has come to realize that his acceptance of the position was a mistake because he had not had sufficient time to prepare the case. Cook was still researching legal questions, pursuing mental examinations of petitioner, and making section 995 and 1538.5 motions after trial was underway.

### 1. *Failure to Have Blood Sample Tested for Alcohol Level*

██ Petitioner contends that counsel's failure to have the blood sample taken from him on the morning of his arrest tested for blood alcohol completely undermined his diminished capacity defense. His contention has merit. Neither trial counsel has provided *any* explanation for this failure, which is particularly inexplicable in light of the fact that the defense theory of diminished capacity relied entirely on alcohol consumption. Unfortunately, the blood sample no longer exists. A declaration by V. Parker Bell, a consultant in criminalistics, establishes that petitioner's blood-alcohol level at the time of the offense could have been estimated if the blood sample taken on June 7 had been tested for alcohol level. Bell states that if the sample had been tested and found to have contained even a trace of alcohol, it would indicate that the minimum blood-alcohol level at 8:30 the prior evening was approximately 0.22 percent to 0.30 percent.

Significant prejudice resulted from this deficiency. The prosecutor relied heavily on the fact that there was no substantiation of petitioner's claim that he had drunk a sizable amount of alcohol on the day of the offense. The matter was exacerbated by counsel's failure to have obtained, transcribed and translated the tape recordings of petitioner's statements to Deputy Medina and Lieutenant Gutierrez in a timely manner. This was not done

until Medina and Gutierrez had already testified for the prosecution, and Gutierrez had been allowed to state that petitioner said he had "consumed in excess of six or seven beers." Although the translation of the statement revealed that petitioner had actually said that he had drunk "much, much more than six or seven beers," counsel never challenged Gutierrez's testimony. Moreover, Gutierrez testified on rebuttal, without impeachment, that petitioner had told him he had "consumed six or seven beers during the day."

Petitioner had consistently told the doctors that he had drunk about 20-24 beers. The credibility of these statements was completely undermined by the inaccurate portrayal Gutierrez gave regarding petitioner's statement to him about the amount of beer he had consumed. The effect was devastating since the prosecutor used the conflict regarding the amount of beer to suggest that everything else petitioner had told the doctors was equally untrue. This in turn called into question the validity of the doctors' opinions since they necessarily depended in large part on the truth of petitioner's statements to them.

### 2. *Failure to Investigate PCP Usage*

Petitioner was interviewed by several psychiatrists and psychologists beginning in September 1981. He consistently told them about his involuntary PCP ingestion and described his physiological and psychological reactions, which were consistent with PCP intoxication. On March 15, 1982, petitioner was interviewed by Dr. Ronald Linder, a PCP researcher, at attorney Lorenz's request. Petitioner told him about the yellow powder that was put in his beer and how he felt afterward. A short time after the interview, and before trial, Dr. Linder obtained a urine sample from petitioner which he had tested at USC Medical Center. The urine sample showed "trace positive" for PCP content.

Dr. Orm Aniline, an associate of Dr. Linder, describes the further testing done and the basis of his request to Lorenz for additional tests: "Based on the history Mr. Sixto related to Dr. Linder, and the trace positive testing of his urine sample at USC Medical Center in March 1982, I asked Lorenz for a part of the blood sample extracted from Sixto on June 7, 1981, the day of his arrest. I wanted to conduct further testing to verify the possibility of PCP concentration in Sixto's blood on the day of the offense. [¶] In May 1982, a blood sample was sent to me by the Kern County Sheriff's laboratory. I had the sample run through the testing equipment at USC Medical Center. This blood sample indicated a positive PCP peak at the detection limit. This, in my opinion, along with the urine sample tested in March 1982, provided equivocal results of PCP in Sixto's system. I then wrote Mr.

Sixto's attorney, Eugene Lorenz, on August 5, 1982 [after the start of trial], advising him an acidification test was necessary to determine if trace levels of PCP were still in Mr. Sixto's blood or urine. This would assist me in deciding whether Sixto was suffering from altered consciousness and diminished capacity at the time of the offense in question. I was aware Mr. Sixto had been in custody since his arrest on June 6, 1981. It was unlikely Sixto could have obtained any PCP while in custody in the Kern County Jail. A positive PCP blood analysis would indicate to me that a quantity of PCP was in his system at the time of his arrest."

Lorenz never replied to Dr. Aniline's letter of August 5, 1982, and no further PCP testing was done. All of Dr. Aniline's communications regarding the Sixto case were with attorney Lorenz.

Dr. Aniline explains in his declaration that PCP has the unique property of remaining in the human body for many months or years while undetectable in the bloodstream or urine. It may be detected by an acidification test, which was recommended here but never done. Dr. Aniline also explains that the lab facilities at USC Medical Center were more advanced than those at Western Laboratories (used by the prosecution) and were able to detect smaller amounts of PCP. Both Dr. Linder and Dr. Aniline state that petitioner's description of the subjective effects of PCP are entirely consistent with scientific findings on PCP intoxication. They also think that petitioner's lack of education and sophistication make it unlikely he could have described these symptoms unless they had actually been experienced.

Dr. Linder states in his declaration: "As a result of the positive test results of the blood sample and the urine sample, I believe Felipe was suffering from PCP intoxication at the time of the alleged homicide. [¶] At the time I interviewed the defendant I was aware of the fact he had been incarcerated for several months and had the opportunity to learn the symptoms of PCP intoxication from conversations with fellow inmates. [¶] Knowing the defendant was placed in a padded cell shortly after his arrest; the claimed lapse of memory for an approximately 45-minute period surrounding the homicide; the physical symptoms described to me by defendant, I seriously discount the possibility defendant made up the symptoms. Based on defendant's abnormal brain waves under alcohol-induced symptoms and his physical description of the symptoms which are consistent with PCP intoxication, I am led to believe defendant actually did ingest PCP and could well have suffered from PCP intoxication at the time of the homicide."

Attorney Cook was aware at the time of trial that the Western Laboratories test of petitioner's blood had been negative for PCP. Although the

record reveals that Lorenz produced the August 5 letter from Dr. Aniline during trial, Cook apparently was unaware of its significance. Cook stated in a declaration in support of the motion for new trial: He was unaware during trial of the letter written by Dr. Linder to Lorenz in March 1982. Cook inadvertently learned of the positive PCP findings of Dr. Linder after the jury's verdict. He also learned that Dr. Linder had been in contact with Lorenz several times in 1982 and that Drs. Linder and Aniline believed that petitioner had a meritorious PCP defense that was not pursued. It had been Cook's understanding at the time of trial that there was no PCP defense. It was on the basis of this previously unknown information that Cook moved for a new trial on the ground of newly discovered evidence, which he believed presented a meritorious and viable defense.

The failure to have obtained the recommended further PCP testing and to have shown the medical experts the reports from Dr. Linder and Dr. Aniline was a crucial deficiency which cannot be attributed to reasonable trial tactics. Dr. Martin Blinder has submitted a declaration stating that he had examined petitioner in May 1982, read the police reports and reports of other medical examinations of petitioner, and had concluded in his report to counsel that PCP was a very likely explanation for the episode; the symptoms described by petitioner were consistent with PCP ingestion and intoxication.

According to Dr. Blinder's report, petitioner stated that all of the guests at the barbecue (including petitioner) were consuming lots of beer and marijuana. The others were also snorting a "yellow powder" that petitioner thought was PCP. They urged petitioner to try it, telling him, "You're not a man if you don't take this," but he repeatedly declined. Around 8 p.m. petitioner left a half can of beer on the table while he went to the bathroom. He returned and finished this can and several additional cans. During this period he was told that PCP had been added to his first can of beer. Petitioner attempted to induce vomiting but failed. "Within a few minutes he began to develop symptoms—his head getting larger, his body feeling light, his vision cloudy, and an evolving sense of restlessness. He estimates that by this time he had consumed approximately 24 cans of beer in a 7-hour period (from 2 to 9 p.m.)." Petitioner said he saw Jorge leave the house, followed him into the field, has no recollection of harming him but does recall seeing him dead. He recalls hearing Jorge's mother call and moving Jorge's body to the edge of the field. At this point petitioner felt "hot, strange, detached—like it wasn't me."

In October 1982, however, immediately before Dr. Blinder was to testify, attorney Cook advised Dr. Blinder that he could not discuss PCP in his testimony because the prosecution's lab report indicated no PCP was found

in petitioner's blood sample. This determination made Dr. Blinder's testimony completely ineffective since his report had been premised on PCP usage. If Dr. Blinder had known of the Aniline-Linder test results, he would have been even more firmly convinced of his original diagnosis and would have stressed the impact of PCP ingestion.

Dr. Richard Burdick, who testified for the prosecution as a rebuttal witness, has submitted a declaration stating that had he known of the two positive PCP tests, he would have answered the questions regarding the issues of deliberation, malice, intent and the general motive for killing "differently and I would probably have said that it was highly probable that his ability to do these things was greatly limited if not absent at the time of the offense." Dr. Burdick notes that he had stated in his rebuttal testimony that he had originally thought that if PCP consumption had been substantiated it might very well have contributed to a significant alteration of petitioner's mental state.

At defense counsel's request the court did not give CALJIC No. 4.23 on involuntary intoxication. Counsel stated that this was a tactical decision based on the lack of any substantive evidence supporting PCP ingestion.

Thus, the jury was never allowed to consider the most plausible explanation for petitioner's conduct. The destructive effects of PCP are widely recognized. According to Dr. Linder, PCP can cause "otherwise law-abiding individuals to commit acts of degradation and violence which are completely out of keeping with their character and which acts are committed without the individual being aware of their actions." Dr. Burdick had stated in his rebuttal testimony that "PCP is one of those [drugs] that will predictably cause psychosis in essentially all of us."

3. *Inadequate Investigation of Mitigating Evidence*

Petitioner claims that trial counsel were ineffective in failing to investigate available evidence of his good character for the penalty trial. In November 1982, after the guilt trial, defense counsel hired an investigator to locate seven witnesses and to serve subpoenas on them to testify at the penalty trial. The investigator, who spoke little Spanish, was unable to locate five of the witnesses. Of the two located, one said he did not know petitioner well enough to testify and the other could not afford the loss of wages to testify. A declaration by petitioner's mother states that she had given defense counsel these seven names and that no one ever told her they were unable to locate any of them. She also gave counsel the names of other people who would have testified favorably about petitioner: Angelita

Pulido, Augustina Rodriguez, Mr. and Mrs. Cruz Razo, and Lourdes Villegas. None of these persons was called as a witness.

Jose Pena, a Spanish-speaking investigator hired by appellate counsel in 1986, was able to locate Trinidad Jara who stated she was living at the same address in the Kernita Trailer Park in 1982 that the previous investigator was unable to find. Pena contacted Angelita Pulido, Augustina Rodriguez, Inocencio and Cruz Razo, and Lourdes Villegas, all of whom said they were available to testify in 1982 but were never contacted. Pulido has been at the same address since 1978, when she first met petitioner and his family. Petitioner's younger brother lived with her while he was attending school. When petitioner was arrested, Pulido told his mother she would be willing to be a witness for him, but she was never contacted until 1986. She knows petitioner to be a hardworking, quiet, well-behaved, and truthful person. Mr. and Mrs. Razo have been living at the same address since 1955, were available to testify but were never contacted. A declaration by Mr. Razo states he has known petitioner and his family for 10 years. Petitioner is a "gentle, quiet, hardworking young man. I know that Felipe does drink beer but he has always done it quietly and I have never seen him drunk and I am not aware of any incident of violence on Felipe's part." A declaration by Lourdes Villegas states that she and petitioner had dated for two years: "I can think of nothing negative I can say about him. We were never sexually active and Felipe never acted improperly toward me. I had the highest regard for Felipe Sixto as a boyfriend and fellow worker."

### Return to Order to Show Cause

The Attorney General asserts in the return that the judgment is valid and that petitioner was not denied the effective assistance of trial counsel.

As to the failure to have obtained a blood-alcohol test and to have pursued the recommended PCP testing, the Attorney General does not attempt to justify counsel's omissions, but instead argues that it is not reasonably probable a result more favorable to petitioner would have resulted in the absence of counsel's failings.[2] The Attorney General notes that the diminished capacity defense presented through expert testimony was based on petitioner's description of his alcohol consumption and of his amnesia at the time of the crime. The jury rejected the diminished capacity defense prem-

---

[2] At oral argument, however, the Attorney General attempted to justify counsel's action by asserting that counsel made a tactical decision not to raise a PCP defense. If so, it could not be said to have been an informed decision on the part of Cook, who was lead counsel. In any event, we need not consider the point since it was not raised in the Attorney General's return. (See *Estate of Davis* (1940) 38 Cal.App.2d 579, 587 [101 P.2d 761].)

ised on petitioner's story of amnesia. This, according to the Attorney General, indicates that the jury did not believe petitioner's story and would not have been any more willing to believe it with blood-alcohol or PCP testing.

Petitioner contends that the Attorney General's argument misses the point. We agree. The jury rejected petitioner's story in the absence of any scientific support for his claim that he had drunk 20 beers and had involuntarily ingested PCP. It does not follow that the jury would still have rejected his claim if it had been supported by scientific evidence. Indeed, the scientific evidence would have greatly bolstered Dr. Blinder's testimony, and it would have materially changed Dr. Burdick's testimony. As to PCP in particular, the jury had little reason to be persuaded by petitioner's version of events in the absence of the critical evidence verifying the existence of PCP in petitioner's system. The jury might well have found petitioner's version believable had it been supported by scientific evidence. Without such support the prosecution was able to cast doubt on and discredit the expert testimony which was premised on the truth of petitioner's unsubstantiated story.

As to the failure to adequately investigate and present available good character evidence at the penalty phase, the Attorney General asserts that counsel fulfilled their obligations by hiring an investigator and that even if that were not sufficient, it is not reasonably probable that a result more favorable to petitioner would have been reached at the penalty phase if the additional witnesses had testified. The Attorney General submits that the proffered testimony of the additional witnesses was essentially cumulative to the evidence that was presented. We need not decide the merits of this argument since, as explained below, we conclude that the judgment of guilt must be reversed.

### Conclusion

Petitioner has established entitlement to relief for ineffectiveness of counsel at the guilt phase. Trial counsel were deficient in failing to have petitioner's blood sample tested for blood alcohol, in failing to have petitioner's statements transcribed and translated earlier, in failing to pursue the recommended further PCP testing, and in failing to present evidence of the PCP testing that had been done. We have already discussed the prejudice flowing from these deficiencies. All that remains is to show that the failure to discover and present this evidence "might have caused a reasonable jury to conclude that the defendant actually lacked the mental capacity that constituted an element of the charged offense." (*People* v. *Williams, supra,* 44 Cal.3d at p. 937.)

As previously stated, the most plausible explanation for petitioner's conduct was a psychotic episode resulting from PCP ingestion. If the jury had believed this theory, it might well have accepted petitioner's statements regarding amnesia and have found him not guilty under instructions on unconsciousness as a result of involuntary intoxication. Short of that, the evidence of PCP ingestion and/or alcohol intoxication might still have caused a reasonable jury to conclude that defendant lacked requisite mental capacity for first degree murder. The finding of first degree murder was based either on premeditation and deliberation or murder in the commission of a lewd and lascivious act, a specific intent crime.

Petitioner failed to receive the level of representation to which he was constitutionally entitled, and his convictions are therefore invalid. Petitioner's first attorney (Lorenz) became completely distracted by his own personal problems, and his second attorney (Cook) was not prepared to serve as lead counsel—a matter which he now acknowledges. Attorney Cook was still researching the law and considering trial strategy after the trial had started. He was greatly hampered by the lack of communication with attorney Lorenz, and he made crucial decisions based on inadequate information. The failure to present a PCP defense was a perfect example. The test results from Dr. Linder and Dr. Aniline would certainly have bolstered petitioner's credibility and the opinions of the doctors which were based on it. In the absence of any objective evidence supporting petitioner's PCP story, the prosecution was able to decimate it. Trial counsel's inadequate preparation left petitioner and his experts vulnerable to prosecutorial challenge regarding both the alcohol and PCP intoxication claims. Counsel should have been ready to challenge Detective Gutierrez's characterization of petitioner's statement about the number of beers he had drunk. They should also have obtained a blood-alcohol test. They should have followed through on the recommended additional PCP testing, and they should have presented the PCP test results that were obtained. Trial counsel simply failed to act reasonably on these matters and caused significant prejudice to petitioner's case.[3]

The petition for writ of habeas corpus is granted. The judgment of conviction is vacated and petitioner is remanded to the Superior Court of Kern County. Upon finality, the clerk shall remit a certified copy of this opinion and order to the superior court for filing, and respondent shall serve another copy thereof on the prosecuting attorney in conformity with section 1382, subdivision (b). (See *In re Hall* (1981) 30 Cal.3d 408, 435, fn. 9 [179

[3] Pursuant to Business and Professions Code section 6086.7, we are required to report our reversal of the judgment for ineffectiveness of counsel to the State Bar of California for investigation of the appropriateness of initiating disciplinary action against attorneys Eugene Lorenz and Robert Cook.

Cal.Rptr. 223, 637 P.2d 690]; *People* v. *Ledesma* (1987) 43 Cal.3d 171, 227 [233 Cal.Rptr. 404, 729 P.2d 839].)

Lucas, C. J., Mosk, J., Broussard, J., Eagleson, J., Kaufman, J., and Kennard, J., concurred.