Filed 2/5/14  P. v. Gastelum CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JESUS RAMON GASTELUM,<br><br>    Defendant and Appellant. | D062985<br><br><br><br>(Super. Ct. No. JCF18906) |

APPEAL from a judgment of the Superior Court of Imperial County, Christopher J. Plourd, Judge.  Affirmed.

Eric R. Larson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., and Susan Miller, Deputy Attorneys General, for Plaintiff and Respondent.

Jesus Ramon Gastelum appeals a judgment after the trial court denied his motion for new trial based on alleged ineffective assistance of counsel, and reinstated the

judgment based on a jury's verdict convicting him of first degree murder (Pen. Code, § 187, subd. (a)) and conspiracy to commit murder (§ 182). On appeal, he contends he was denied effective representation of counsel in two regards: (1) counsel did not investigate and introduce evidence that another person (Mr. Ruiz) admitted to being an accomplice to the shooting, and (2) counsel did not investigate and introduce an expert to attack the credibility of eyewitness identification evidence.

I

FACTUAL AND PROCEDURAL BACKGROUND

A. <u>Evidence Against Gastelum</u>[1]

During the evening of September 15, 2001, Daniel Villa, a gang member and drug abuser, went to Richard Armenta's house in Brawley to buy drugs from Armenta. Armenta agreed to sell Villa drugs, but he asked Villa, and Villa agreed, to first accompany him to a store to buy beer. On the way to the store, Armenta drove by a house party on B Street in the Brole (i.e., Broleno) gang area. There were many gang members on the patio outside the house. They recognized Armenta's car and turned around. Armenta asked Villa whether he "would be willing to shoot" them if he gave Villa his gun. Villa did not answer Armenta's question.

On their return to Armenta's house, Gastelum (whose moniker is "Pookie") and some other men were there. Armenta asked the group if someone would volunteer to do

---

[1]     In this appeal, both parties rely on this court's factual recitation from the prior appeal of Gastelum's conviction in *People v. Gastelum* (D053935, Nov. 19, 2009), (*Gastelum I*). Accordingly, our factual statement is taken from *Gastelum I.*

2

a shooting of gang members at the house party. Gastelum answered that he would do the job for his gang. Armenta went to another room and brought back a big speaker from which he removed a black revolver. Armenta gave it to Gastelum, who then removed its bullets. Armenta and Gastelum cleaned the gun and bullets. After Armenta reloaded the gun, Gastelum put the gun in the waistband of his pants. Gastelum and Armenta left the house and drove away in Armenta's mother's Camry (a different car than that Armenta drove to the store earlier).

At about 9:30 p.m. or 10:00 p.m., Francisco Hernandez, then 16 years old, arrived at the house party. There were about 10 to 13 people there. Later, Hernandez was standing in the front yard inside the fence when he saw someone coming down the street who he initially believed was a friend. The person approached the gate and said, "Come here." When Hernandez was about five to six feet from the gate, the person (identified at trial as Gastelum) pulled out a gun and began firing it at him. As Hernandez turned and ran away, he was shot in the back. Once inside the house, he learned he was bleeding. Hernandez also saw that Jesse Garcia, his friend, had been shot and was lying on the floor with blood pouring out of his head. A few months later, Garcia, also 16 years old, died from his gunshot wounds.

Villa, who had remained at Armenta's house, heard on a police scanner that there had been a shooting on B Street. Within two to three minutes, Armenta and Gastelum arrived back at Armenta's house. Gastelum appeared happy and described how he got out of the car, knocked on the door of the house, and fired his gun at the head of the person who opened the door while stating the name of his (Gastelum's) gang, Chicali Brasas.

3

Gastelum stated he also fired his gun at and thought he hit another person near the door. Armenta stated the people were gang members and were drinking and that what Gastelum had done "was all fine." Gastelum told everyone in the room they were the only ones who would know what had happened and, if someone said something, the "same thing would happen to them." Gastelum and Armenta removed the remaining bullets from the gun and then Armenta took the gun to another room.

At about 8:00 p.m. or 9:00 p.m. on September 15, 2001, Armenta went to the home of Israel Salazar, then an active Chicali Brasas gang member, and asked him whether he would be willing to go with him to "get" (i.e., "blast" or shoot) some Broleno gang members while they were "slipping" (i.e., unaware) at a party on B Street. Armenta stated he was going over to Pete Castellanos's house to have a "kickback."[2] Salazar did not go with Armenta because he was arguing with his "old lady" at the time.

A few hours later, Armenta returned to Salazar's home and asked him to hide a gun and not to tell anyone. When Salazar asked him what happened, Armenta stated: "Some shit went down on B Street." Armenta appeared scared. Salazar agreed to hold the gun for Armenta, but he did not actually see the gun that night. Salazar apparently told Armenta to hide the gun in a wood pile wherever he wanted to. When Salazar learned the following day what happened on B Street, he asked a friend to tell Armenta to pick up his gun. During telephone conversations, Armenta told Salazar that during the B

---

[2]     Castellanos was a Chicali Brasas gang member who had been shot and paralyzed by a Broleno gang member, and Armenta stated that somebody "had to pay back for it" (i.e., be shot) in retaliation for Castellanos's shooting. (*Gastelum I, supra,* D053935, at p. 4.)

4

Street incident someone got shot in the head. When Salazar asked Armenta if he was the shooter, Armenta replied, "No. It was Pookie," i.e., Gastelum. Armenta stated that the reason for the shooting was "[s]omebody paid back for what happened to Peter Boy," i.e., Castellanos. A few days after Salazar hid the gun, Armenta and two other gang members came to Salazar's home and retrieved the gun, which was wrapped in a bandana, and ammunition in a plastic bag. Salazar saw the gun was a faded black revolver with a six-inch barrel, and the bullets bore the markings ".38 S&W."

At a joint trial on the charges against Gastelum and Armenta (who was charged with the same offenses as Gastelum), Villa, Hernandez and Salazar testified substantially as described above. Testimonies of two witnesses were also admitted showing that on conclusion of the first day of Villa's testimony, Gastelum threatened Villa, stating "I'm going to kill you, puto." Salazar testified that while he was incarcerated with Gastelum, Gastelum asked him not to testify as a "favor" and to tell the judge he (Salazar) was "high" and talking "nonsense." The prosecution also presented the testimony of Luis Santoyo, a Chicali gang member, who stated he was at Armenta's house about two years earlier when Armenta mentioned a shooting in the presence of Gastelum and Armenta's brother. Armenta stated that a man named Santos took the gun to Mexico. Armenta spoke a lot about the shooting and was happy while doing so. Although Gastelum was present while Armenta spoke about the shooting, he remained silent except for telling Armenta to be quiet and not talk about it. Armenta stated the motive for the shooting was to get someone back for Pete, i.e., Castellanos, who got shot. When asked what Armenta told him about the shooting, Santoyo testified: "He just told me they were kicking it at

5

my friend Pete Castellanos'[s] house. Right there it was him, Jesse [i.e., Gastelum], and some other guy, Happy. They left and they went around cruising somewhere, wherever it was at. And then he parked the car and Jesse [i.e., Gastelum] got off and he had did what he did and came back to the car. And they took off." Santoyo also testified that on another occasion he spoke with Gastelum "on the streets" about the shooting and Gastelum admitted shooting Garcia.

In his defense, Gastelum testified that he did not shoot Garcia because he was in Huntington Park the night of the shooting. He also testified he was a member of the Imperial gang and socialized with both Broleno and Chicali gang members. Gastelum's father, sister and grandmother testified that he lived in Huntington Park during the time period of the shooting. Gastelum's sister also testified he stayed at home the weekend after the terrorist attacks of September 11, 2001. Erik Portugal testified he was a member of the Broleno gang and asked Hernandez if he knew who shot him. Hernandez told him he did not know, explaining it was too dark, he was not paying attention, and he was busy having a good time at the party. Hernandez stated he really did not see anything.

B. The Verdict and *Gastelum I*

The jury found Gastelum guilty of the charged offenses, and the trial court sentenced Gastelum to a term of 25 years to life in prison on count 1 and, pursuant to Penal Code section 654, stayed execution of the term it imposed for count 2. In *Gastelum I*, this court rejected the majority of Gastelum's claims, but found the trial court erred by

6

not conducting a *Marsden*[3] hearing on his request for substitute counsel to represent him in investigating the grounds for, and filing a motion seeking, a new trial based on ineffective assistance of counsel.  (*Gastelum I, supra*, D053935, at pp. 27-32.)  This court reversed and remanded the matter with directions that the trial court conduct a postverdict *Marsden* hearing to allow Gastelum to state his reasons in support of his *Marsden* motion, to request a response from his trial counsel, and then exercise its discretion to grant Gastelum's request for substitute counsel to represent him on a motion for new trial based on ineffective assistance of counsel.  This court further instructed that if the trial court denied Gastelum's *Marsden* motion after conducting a *Marsden* hearing, or granted that motion but then denied a motion for new trial filed by substitute counsel (or if substitute counsel after investigation decides there is no basis on which to file a motion for new trial), the trial court should reinstate the judgment with specified modifications. (*Gastelum,* at pp. 34-35.)

## II

## THE CURRENT APPEAL

A. <u>The Evidentiary Hearing on Gastelum's New Trial Motion</u>

On remand, the trial court held a *Marsden* hearing and appointed new counsel. New counsel then moved for a new trial alleging Gastelum's trial counsel (Mr. Storey) provided ineffective assistance of trial counsel in several particulars, including (1) failure to investigate and introduce an expert on the vagaries of eyewitness identification to

---

3       *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

undermine the credibility of Hernandez's eyewitness identification of Gastelum as the shooter, and (2) failure to investigate other witnesses and to introduce evidence of (among other things) that another person (Ruiz) stated he accompanied Armenta to the attack and it was Armenta who opened fire on the victims.

The court held an extensive evidentiary hearing over several sessions during which numerous witnesses testified. Gastelum's testimony, which the trial court found was not credible, asserted he asked Storey to hire an expert on eyewitness identifications and Storey affirmed he would hire an expert but never did. Gastelum also asked Storey to locate and interview numerous witnesses, including Mr. Espinoza and Ruiz, but Gastelum believed Storey did not investigate those witnesses or interview them. Gastelum also testified he asked Storey to locate and interview several other witnesses, but Storey did not do so, and Storey deflected some of Gastelum's inquiries by stating he was too busy. Gastelum also claimed he told Storey he wanted to testify, and Storey advised him not to testify, but then without warning put Gastelum on the stand without preparing him.

Storey testified he had practiced criminal law for 27 years, and had visited Gastelum 16 to 18 times to prepare for trial. Gastelum often suggested people who he thought might help his case, and Storey's general practice was to obtain the person's name and contact information and give the information to Storey's investigator (Mr. Wallet) for Wallet to contact the witness. Wallet tried contacting all of these people, although he was unable to find some of them and others refused to talk to him. When Wallet could

8

not find specific people, Storey would follow up with Gastelum and try to get additional information to help locate them.

Storey considered using an expert on eyewitness identification but rejected the idea because Gastelum had been picked out of a lineup and there were not any "cross-racial situations." Storey believed an expert could have been harmful to Gastelum because the lineup and identification of Gastelum was "solid" and Storey believed an expert would have "been more for the prosecution than for the defense" and Storey did not want to "make [the identification] any [more] solvent than it already was." Storey explained there are many other ways to impeach an eyewitness and he used some of those approaches during trial.

Storey apparently was not specifically asked about his efforts to locate Espinoza or Ruiz. Gastelum testified that among the discovery from police given to him by Storey was a summary of an interview by Sergeant Myers of a Mr. Espinoza, in which Espinoza claimed that a Mr. Ruiz admitted Ruiz had been involved with Armenta in the shooting incident. Gastelum asked Storey to look into this lead but, to Gastelum's knowledge, Storey did not follow up on interviewing or subpoenaing Espinoza or Ruiz. Although Storey's memory had faded and he could only recall some of the people he directed his investigator to locate, he explained that it was pattern and practice to have his investigator try to locate all witnesses at the scene, and to also have his investigator try to locate and interview all people that Gastelum suggested might be helpful to the defense.

Wallet, Storey's investigator, also did not have a specific recollection of *all* of the people he tried to locate and interview. He had no specific memory of reading the police

9

report containing Espinoza's claimed conversation with Ruiz, or of discussing Espinoza with Storey, or of trying to develop the lead any further, but he explained that "it's not that it didn't happen, I just don't remember it." Wallet testified he conducted over 20 interviews in connection with his investigation, some of which may have involved multiple persons during a single interview, although many of the times the people refused to speak with him. Wallet accompanied Storey for most of Storey's meetings with Gastelum, and Wallet did investigate witnesses that Gastelum asked to be interviewed as well as witnesses Storey suggested and that Gastelum had not identified. As a general rule, Wallet tried to locate all of the persons mentioned in the discovery.

B. The Trial Court's Ruling

The trial court addressed and rejected Gastelum's claim--Storey did not adequately investigate and interview other witnesses, and that constituted ineffective assistance of counsel. The court noted Storey "made efforts to interview a number of people" and was "dealing with a cold case that was four or five years old by the time he got it." The trial court, after noting Gastelum had not located anyone or shown that "had they been called they would have said something favorable or significant that would have made a difference in this particular case," found Storey tried to interview all of the persons at the scene of the shooting, which was "a good way to investigate a case and at least start out and then . . . develop the case from there." Based on the trial court's review of the discovery and the trial record, the trial court found Storey was "faced with a very challenging case . . . an overwhelming case that appeared to be against [Gastelum]," and Storey spent significant time investigating and preparing but did not finding "anything

10

significant. In fact, as time goes on, the evidence gets worse" because Gastelum (in addition to his "admissions to a number of witnesses") threatened a witness during trial.

The trial court stated the "only argument . . . even coming close . . . [is] the issue regarding the eyewitness identification expert." After noting *Strickland* [4] requires a showing that failure to call an eyewitness identification expert fell below the standard of care, the court concluded Storey made a judgment call on whether to call such an expert and *Strickland* does not permit second-guessing of tactical decisions. The court noted one of the eyewitnesses against Gastelum was Mr. Villa, who knew Gastelum and saw him leave with Armenta and a gun and, within minutes of hearing about the shooting on a police scanner, saw Gastelum and Armenta return and heard Gastelum brag about the shooting. The trial court concluded there was nothing an eyewitness expert could have accomplished because Villa knew Gastelum. The court also noted the other eyewitness, Mr. Hernandez, was just feet from, and recognized, Gastelum when he fired the gun at Hernandez. Based on all of the facts, the court was satisfied that Storey made an informed decision not to call an expert because it could have harmed Gastelum's case.

The court also noted the evidence against Gastelum was "overwhelming," because a percipient witness placed Gastelum with Armenta immediately before and after the shooting, another percipient witness at the scene identified Gastelum as the shooter, witnesses heard his admissions about being the shooter, Armenta's letter implicated Gastelum in the shooting, and Gastelum attempted to intimidate witnesses before and

---

[4]     *Strickland v. Washington* (1984) 466 U.S. 668.

11

during trial. The trial court reasoned that, even had Storey made errors, they would have to be deemed harmless.

## II

## ANALYSIS

To establish ineffective assistance of counsel, Gastelum has the burden of showing both that counsel's performance was deficient because it fell below an objective standard of reasonableness under prevailing professional norms, and that it is reasonably probable the verdict would have been more favorable to him absent counsel's error. (See, e.g., *People v. Hernandez* (2004) 33 Cal.4th 1040, 1052-1053.)

When evaluating the first prong, "[w]e presume that counsel rendered adequate assistance and exercised reasonable professional judgment in making significant trial decisions." (*People v. Holt* (1997) 15 Cal.4th 619, 703.) "In evaluating a defendant's claim of deficient performance by counsel, there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance' [citations], and we accord great deference to counsel's tactical decisions. [Citation.] . . . Accordingly, a reviewing court will reverse a conviction on the ground of inadequate counsel 'only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission.' " (*People v. Frye* (1998) 18 Cal.4th 894, 979-980, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) To demonstrate ineffective assistance based on an alleged failure to investigate, the defendant "must prove that counsel failed to make particular investigations and that the omissions resulted

12

in the denial of or inadequate presentation of a potentially meritorious defense." (*In re Sixto* (1989) 48 Cal.3d 1247, 1257.)

When assessing prejudice, the defendant must also "carry his burden of proving prejudice as a 'demonstrable reality,' not simply speculation as to the effect of the errors or omissions of counsel." (*People v. Williams* (1988) 44 Cal.3d 883, 937.)  In an appropriate case, we may resolve an ineffectiveness claim on the ground of lack of prejudice without determining whether counsel's performance was deficient.  (*Strickland v. Washington, supra,* 466 U.S. at p. 697; *In re Fields* (1990) 51 Cal.3d 1063, 1079.)

A. Failure to Call Eyewitness Expert

Gastelum argues Storey's not calling an expert on eyewitness identification was ineffective assistance of counsel.  We are not persuaded by this argument for several reasons.

First, Storey explained he has used eyewitness experts in the past and considered but rejected use of an expert, and explained his reasons for doing so: he believed the fact that multiple witnesses identified Gastelum as the shooter, none of whose identifications might have been impeded by cross-racial identifications and one of whom personally knew him, coupled with the fact Gastelum was identified in a lineup, could have made an eyewitness expert more helpful to the prosecution than to the defense.  Storey determined the safer approach was to cross-examine the witnesses to impeach the credibility of their identifications, and did so in this case, and to employ closing argument to point out why those identifications should be distrusted.  Because we accord great deference to

13

counsel's tactical decisions and will not second-guess those decisions, Gastelum has not shown the first prong required to establish ineffective assistance of counsel.

Second, Gastelum's showing below also did not establish the second prong, because there was no evidence that not calling an expert resulted in the failure to present a potentially meritorious defense. (*In re Sixto, supra,* 48 Cal.3d at p. 1257.) Gastelum's new trial motion contained no expert declaration outlining what evidence an expert could have been presented that would have undermined Villa's and Hernandez's identification of Gastelum as the shooter, or that the "expert witness approach" (which apparently attempts to show the witnesses honestly but mistakenly believed Gastelum was the shooter) was so clearly superior to the strategy employed by Storey (which appeared to attempt to show the witnesses were motivated to lie about Gastelum's involvement) that Storey's tactical decision to pursue the latter rather than the former approach deprived Gastelum of a potentially meritorious defense.

We conclude Gastelum has not satisfied his burden of showing Storey's decision not to call an eyewitness expert fell outside the wide range of reasonable professional assistance to which Gastelum was entitled, or that the decision resulted in the failure to present a potentially meritorious defense.

B. Failure to Introduce Third Party Culpability Evidence

Gastelum argues Storey provided ineffective assistance of counsel because he did not investigate a report, made by a Mr. Espinoza when Espinoza was interviewed by police in 2001, in which Espinoza claimed that some time after the shooting Mr. George Ruiz told Espinoza that Ruiz and Armenta had been the persons who went to the party

14

and it was Armenta who was the shooter. Gastelum argues that Storey's failure to investigate and locate Espinoza and/or Ruiz, and to then subpoena them for trial to introduce Ruiz's confession into evidence, constituted ineffective assistance of counsel.

Gastelum correctly notes that failure to investigate potentially exculpatory evidence can form the basis for an ineffective assistance claim. However, his claim here is not persuasive because we are unconvinced Gastelum established either prong necessary to an ineffective assistance claim.

The first prong required him to show Storey "failed to make particular investigations." (*In re Sixto, supra,* 48 Cal.3d at p. 1257.) Gastelum's argument on appeal appears to be based on a factual predicate--i.e., Storey made *no* efforts to locate Espinoza and/or Ruiz--apparently rejected by the trial court. Although the record contains no *express* finding as to Storey's efforts to locate Espinoza and/or Ruiz, it does contain a general recitation of the trial court's reasons for rejecting Gastelum's challenge to the adequacy of Storey's attempts to locate a number of witnesses. Because we indulge all intendments in support of the judgment, including implied factual findings for which there is support in the evidence (see, e.g., *People v. James* (1977) 19 Cal.3d 99, 107 [on appeal all presumptions indulged in support of judgment and trial court's findings whether express or implied must be upheld if supported by substantial evidence]), and there was substantial evidence Storey made *some* efforts to find significant witnesses identified by Gastelum, we presume the court impliedly found Storey made some efforts to locate Espinoza and/or Ruiz. That finding is supported by the evidence that as a general rule Wallet tried to locate all of the persons mentioned in the discovery, and

15

Storey's testimony that it was his pattern and practice to have his investigator try to locate and interview all people the defendant suggested might be helpful to the defense. To the extent Gastelum's appellate argument on the first prong is based on the slightly distinct argument that Storey made *inadequate* efforts to locate Espinoza and/or Ruiz, the trial court specifically addressed and rejected Gastelum's claim that Storey failed to adequately investigate and interview other witnesses, noting Storey "made efforts to interview a number of people" and was "dealing with a cold case that was four or five years old by the time he got it," and had spent significant time to investigate and prepare but was unable to "find anything significant." This appears to constitute an implied finding that Storey and his investigator did attempt to locate significant witnesses and were simply unable to find Espinoza and/or Ruiz for purposes of subpoenaing them for trial, and Gastelum produced no evidence in connection with his motion for new trial showing that Ruiz and/or Espinoza was actually available and locatable. The trial court rejected his showing on the first prong, and we defer to that factual determination.

We are equally unconvinced Gastelum carried his burden as to the prejudice prong from Storey's alleged failure to investigate, because we cannot conclude "there is a reasonable probability--i.e., a probability sufficient to undermine confidence in the outcome--that the additional evidence that might have been discovered would have altered the result." (*In re Fields, supra,* 51 Cal.3d at pp. 1080-1081.) Gastelum's showing below was that Espinoza claimed Ruiz told him Ruiz went to the scene with Armenta, and that "Armenta pulled out a gun and opened fire." It is pure speculation that, even assuming Storey had been able to locate and subpoena him for trial, Ruiz

16

would have been willing to waive his Fifth Amendment privilege and testify he was with Armenta when Armenta pulled out the gun and opened fire.[5]  (*People v. Williams, supra,* 44 Cal.3d at p. 937 [appellant must carry burden of proving prejudice as demonstrable reality, not simply speculation as to the effect of counsel's errors].)  Moreover, even assuming evidence that Ruiz admitted to being present at the scene had been introduced at trial, that evidence (although potentially inculpatory as to Ruiz) was not necessarily exculpatory as to Gastelum because there was no evidence Ruiz told Espinoza that it was *only* Ruiz and Armenta who went to the scene, and therefore it was not necessarily inconsistent with Gastelum *also* accompanying Armenta to the scene.

Finally, the second prong for an ineffective assistance of counsel claim requires Gastelum to show that, but for counsel's purported error, there is a reasonable probability the result of the proceeding would have been different.  (*People v. Sapp* (2003) 31 Cal.4th 240, 263.)  At the original trial, the defense introduced testimony from numerous witnesses testifying (1) Gastelum was not there, (2) there were reasons to disbelieve

---

[5]  Gastelum asserts on appeal that, if Ruiz had been subpoenaed and either asserted his Fifth Amendment privilege or was otherwise unavailable to testify, Espinoza could have been subpoenaed to testify to Ruiz's statements because they would fall within an exception to the hearsay rule as a declaration against Ruiz's penal interest under Evidence Code section 1230.  However, even ignoring that this argument speculates Storey could *also* have located Espinoza, there was nothing in the police report showing Ruiz's statements manifestly fell with the declaration against penal interest exception to the hearsay rule.  Ruiz's statements to Espinoza contained his admission he accompanied Armenta to the scene; however, Ruiz's statements to Espinoza did *not* contain his admission he accompanied Armenta *knowing* of Armenta's purpose or plan, which would be an essential fact before Ruiz's statement would constitute an admission against his penal interest.  Accordingly, it is speculation that a court might have overruled a hearsay objection to Espinoza's testimony about Ruiz's statements under the declaration against penal interest exception.

Hernandez's identification of the shooter, and (3) there were reasons to disbelieve Villa's and Santoyo's testimonies implicating Gastelum.[6] However, the jury apparently rejected their testimonies and instead credited the testimony of Villa (who testified Gastelum left with Armenta before the shooting and returned with Armenta minutes after the shooting, and admitted to Villa to being the shooter), Hernandez (who identified Gastelum as the shooter), and Santoyo (who testified that both Armenta and Gastelum told him Gastelum was the shooter). It is not reasonably likely the result of the proceeding would have been different even had the defense called another witness (Ruiz) to testify Gastelum was not there and someone else was the shooter.

DISPOSITION

The judgment is affirmed.

McDONALD, J.

WE CONCUR:

NARES, Acting P. J.

McINTYRE, J.

---

6 For example, a witness testified he was with Armenta at Armenta's house that evening and neither Gastelum nor Villa was there, and a police witness testified Santoyo changed his statement about Gastelum's admission to being involved.