Filed 12/30/15  In re Munoz CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

|  |  |
|---|---|
| In re ELIAS IVAN MUNOZ,<br><br>on Habeas Corpus. | B265673<br><br>(Los Angeles County<br>Super. Ct. No. PA055243) |

ORIGINAL PROCEEDINGS; petition for writ of habeas corpus.  Ronald S. Coen, Judge.  Petition granted.

Edward H. Schulman, under appointment by the Court of Appeal, for Petitioner.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Michael R. Johnsen, Supervising Deputy Attorney General, and Wyatt E. Bloomfield, Deputy Attorney General, for Respondent.

_____

In 2007, a jury found petitioner Elias Ivan Munoz guilty of first degree murder and the trial court sentenced him to 50 years to life in state prison. Munoz's appointed appellate counsel raised only one issue on appeal—that the court prejudicially erred when it admitted statements obtained involuntarily from Munoz into evidence. This court rejected the argument and affirmed the judgment in an unpublished opinion.[1] On July 28, 2015, Munoz filed the instant petition for writ of habeas corpus. He contends that his appellate counsel rendered ineffective assistance by failing to challenge the trial court's instructions given in response to the jury's inquiries on aider and abettor culpability for first degree murder. We agree and grant his petition for writ of habeas corpus. We further conditionally reverse the judgment and remand with instructions.

## STATEMENT OF FACTS

The statement of facts is derived from our unpublished opinion affirming Munoz's first degree murder conviction as follows.

"In February 2006, Carlos Pedroza lived in a second floor apartment which had a balcony overlooking Rayen Street. Pedroza arrived home in the early morning hours of February 11 and parked on Rayen Street in front of the apartment building. On the way to his apartment, he walked past two male Hispanics with shaved heads, who were standing in front of the apartment building and appeared to be drinking. While sitting in the living room watching television, Pedroza heard a vehicle's tires squealing to a stop, followed by a loud argument involving two male voices, and four or five gunshots. Pedroza then heard talking, the sound of persons entering a vehicle, the noise of a vehicle's engine, and the squealing of tires as the vehicle drove away.

---

[1] We take judicial notice of the record in *People v. Munoz* (Mar. 10, 2009, B205117) [nonpub. opn.]. (Evid. Code, §§ 452, subd. (d), 459, subd. (a).)

"Pedroza went to the balcony window and saw a dark four-door car exit the driveway of the apartment across the street and stop in front of his apartment on Rayen. The same two males who had been standing across the street got into the car with one or two other males before the car sped away. Pedroza went downstairs to the front of his apartment building. He spoke to the security guard standing on the sidewalk, who directed him to another person—victim Godoy—on the street, lying prostrate beside a parked sports utility vehicle. Godoy had a bullet wound in the back of his head. The guard used his cell phone to call for an ambulance. Pedroza went back to his apartment.

"Godoy lived on the same city block where he was killed, in territory claimed by the Langdon Street gang. Godoy was a member of the Mara Salvatrucha (MS) street gang, a rival of Langdon Street. The murder occurred at approximately 3:18 a.m. Los Angeles Police Department Officer Efren Gutierrez arrived at the scene at 5:30 a.m. He saw expended bullet casings around Godoy's body. There was a cell phone underneath the SUV, along with a baseball cap and numerous empty beer bottles strewn nearby. There were a number of beer bottles in front of the apartment building across the street from the victim's body.

"Medical Examiner Susan Selser determined that Godoy suffered two fatal bullet wounds that entered the back of his head. He had also suffered blunt force trauma to the back of the head, independent of the gunshots, along with abrasions to the side of his head, his knees, elbows, back, hand, and wrist. Godoy had various tattoos, including 'MARA SALVATRUCHA' tattooed on his back.

"Detective Nicole Kittle testified that she and her partner, Detective John Fleming, interviewed [Munoz] at the police station on March 14, 2006. The interview was recorded without [Munoz's] knowledge. The audiotape was played to the jury, as was the audiotape of [Munoz's] subsequent interview with Detective Kittle and Officer Gutierrez on May 10, 2006. In the first interrogation, [Munoz] denied being present at the shooting incident, but admitted to possessing the firearm that was proved to be the murder weapon. In the second, he admitted being present at the shooting. He gave the

3

loaded handgun to a person called Tiny, after Tiny made a gang threat to Godoy, just before the shooting occurred.

"At the first interview's conclusion, the detectives accompanied [Munoz] to his apartment, where [Munoz] showed them the gun he had referenced in the interview. It was a .32 caliber automatic, found in his mother's bedroom nightstand or desk in a concealed compartment. There were bullets in the gun's magazine. A criminalist determined that the bullets and casings found at the murder scene had been fired from that same handgun. Other items recovered from the apartment included a black handkerchief, a notebook entitled, 'Langdon Private Book Lil Gumby' Shit,' a box labeled, 'Gumby,' 'Langdon,' 'Langdon 13,' 'Pee-Wee,' and 'Street.'

"Sergeant Robert Nakamura of the Los Angeles Police Department and his partner were in an unmarked patrol vehicle on March 14, 2006, in Langdon Street territory. He saw a Toyota Camry driving westbound on Rayen Street near Sepulveda Boulevard. The driver and two passengers were male Hispanics with shaved heads. The Camry stopped and [Munoz] stepped onto the street, approached the passenger side, and spoke to the occupants. Within a short time, [Munoz] entered the back seat and the car drove away. The officers followed. Sergeant Nakamura saw [Munoz] flash a Langdon Street gang sign with his hand in the direction of a number of male Hispanics standing in front of an apartment building. The officers stopped the Camry. In addition to [Munoz], the occupants included Langdon Street gang member Juan Carrillo (also know[n] as Little Youngster and Tiny).

"After the murder, Officer Gutierrez observed gang graffiti painted on a storage shed near the murder scene, referring to Godoy's killing. The graffiti mentioned Langdon Street and crossed out the victim's initials and the initials of his gang. The prosecution's gang expert testified that she examined the graffiti and opined that it showed Langdon Street's antipathy toward MS.

"Jesse Pahua was in custody for disregarding a warrant to appear in [Munoz's] trial. He had been a member of Langdon Street since he was 12 years old, but he quit six

4

years later in August 2006, when his daughter was born. At that time, the gang had approximately 40 members. His gang moniker was 'Silent.' [Munoz] was a member with the moniker, 'Lil Gumby.' Pahua denied any knowledge of a gun being found after the Godoy killing. When interviewed by Detective Kittle and Officer Gutierrez on May 3, 2006, he told them that the firearm recovered from [Munoz's] residence was the same gun [Munoz] had shown him previously at [Munoz's] residence.

"A criminalist examined fingerprints on beer cartons found at the crime scene. He found matches to James Reyes. Fingerprints on beer bottles and cans from the crime scene resulted in matches to Walter Martinez and Oscar Murillo. There were no identifiable prints on the .32 caliber handgun.

"Officer Shawna Green testified as an expert in criminal street gangs, specializing in the Langdon Street gang. In February 2006, the gang had approximately 200 documented members. The murder scene was located in the middle of the gang's territory. MS is an enemy or rival gang. Langdon Street's primary activities are committing a variety of crimes, including narcotics sales and murders. [Munoz] was an active member of the gang with the moniker, 'Lil Gumby.' The written materials recovered from his residence following his arrest tended to show his affiliation with Langdon Street. Also recovered were photographs of [Munoz] and fellow gang members Luis 'Tiny' Martinez, Juan 'Lil Youngster' Carrillo, Frank Angel 'Troubles' Castrellon, and James 'Jimmy" Reyes. The expert testified that Jesse 'Little Silent' Pahua, Oscar 'Dopey' Garibay, Oscar 'Loco' Murillo, Walter 'Little Puppet' Martinez, and Osmin Rodriguez are members of Langdon Street. Officer Green testified as to the commission of predicate crimes for purposes of the criminal street gang allegations.

"Answering a hypothetical question that reflected the prosecution's evidence concerning the Godoy shooting, which incorporated some of [Munoz's] admissions from his second interview, Officer Green opined the shooting would have been committed for the benefit of the Langdon Street gang because it demonstrated its willingness to kill gang rivals who ventured into Langdon Street territory.

**Defense**

"Saemm Gonzales, the cousin of prosecution witness Evelyn Gonzales, testified that Evelyn and [Munoz] were dating in March 2006. [Munoz] would periodically stay overnight at the Gonzales residence. On the night of the Godoy killing, [Munoz] attended a family party. They did not return until approximately 3:00 a.m. The streets around the murder scene were blocked off because of the police investigation. [Munoz] testified that he grew up and lived in Langdon Street territory. [Munoz] was a member of the Langdon Street gang. None of his tattoos is gang related. He was dating Evelyn around the time of the Godoy killing and is likely the father of her child.

"In the months leading up to the Godoy killing, [Munoz] was staying either with Evelyn at her residence on Rayen Street or at his mother's home. On the night of the shooting, he went to a party with Evelyn's family. They all drove home in the same car. On the way home, at approximately 3:00 a.m., he noticed an ambulance and police activity in the area of the murder. Because nearby streets were closed by the police, they had to take an alternative route to Evelyn's apartment, where he slept. That morning, Evelyn left on a trip and he took their child. He assumed a Langdon Street gang member had been shot. [Munoz] walked to the crime scene and asked some neighbors what had happened. He was told, 'Somebody was killed.'

"As his part-time employer did not call him to work that day, he remained at Evelyn's residence. A few days later, he was 'kicking it with a couple friends'—two Langdon Street members and two young women. One of the males, Marcos or 'Snoop,' pulled out the gun and told [Munoz] to 'hold it.' Not wanting to 'look like a sissy,' he took the weapon, although he did not know it had been used in the Godoy shooting. Prior to his arrest in March, he showed the gun to Jesse 'Silent' Pahua, who advised [Munoz] to 'keep it where you have it.'

6

"During the police interview, [Munoz] misled the officers about the source of the gun because he was afraid of retribution from the gang. He had no firsthand information about the killing. When he was arrested and taken to the police station for questioning in May, he was very tired and could barely hold his head up. During the interrogation, Detective Kittle was respectful and nice; Officer Gutierrez was mean and aggressive. When Detective Kittle was out of the room, Officer Gutierrez was screaming at him. He told [Munoz] he would never see his children again, unless he told the officer what he wanted to hear. At that time, [Munoz's] son was four days old. [Munoz] was not drinking beer with any Langdon Street members before the Godoy shooting, he did not give the gun to Tiny, he was not present during the shooting, and he did not flee with the shooters. On cross-examination, [Munoz] said he gave the officers the false story that he handed the gun to Tiny just before the shooting because [Munoz] believed the officers would let him go home if he was not the shooter." (*People v. Munoz* (Mar. 10, 2009, B205117) [nonpub. opn.], fn. omitted.)

## PROCEDURAL HISTORY

On September 13, 2007, a jury found Munoz guilty of first degree murder of Godoy (Pen. Code, § 187, subd. (a)),[2] finding the murder was committed to benefit a criminal street gang (§ 186.22, subd. (b)(1)). Allegations that a principal used a firearm in the commission of the murder were also found true (§ 12022.53, subds. (b)-(e)). Munoz received a sentence of 50 years to life, consisting of consecutive terms of 25 years to life for the substantive offense and for the firearm enhancement. Additional firearm enhancements were stayed (§ 12022.53, subd. (f)), and the gang enhancement was dismissed (§ 12022.53, subd. (e)(2)).

On appeal, Munoz's appointed counsel, Gordon S. Brownell, only argued that the introduction of his tape-recorded admissions made in two custodial interrogations

---

[2] All further references are to the Penal Code, unless otherwise stated.

violated the due process requirements of the Fifth and Fourteenth Amendments to the federal Constitution because those admissions were induced by promises of leniency and were therefore involuntary. We held that the inculpatory statements were made voluntarily, without any improper promises, threats, or coercion by the detectives, and affirmed the judgment in an unpublished opinion. (*People v. Munoz* (Mar. 10, 2009, B205117) [nonpub. opn.].) On April 17, 2009, Brownell filed a petition for review in the California Supreme Court, which reiterated his argument on appeal. The petition was denied.

On April 24, 2015, an attorney for the California Appellate Project (CAP) wrote a letter to this court indicating that Brownell had overlooked a key issue. In October 2014, Munoz wrote to CAP asking whether a recent California Supreme Court decision might benefit him. A CAP attorney then reviewed the appellate opinion and record in his case. After concluding that the recent Supreme Court decision did not apply to him, the attorney "discovered a potentially significant misinstruction" by the trial court in responding to the jury's inquiries on the aider and abettor culpability for first degree murder. CAP "contacted [Brownell] three times for his input, eventually sending him copies of the relevant jury questions, the arguments by counsel, and the court's instructions to the jury." Brownell declined to seek any relief on behalf of Munoz. Consequently, CAP asked this court to appoint new counsel to review the record and to determine whether to seek recall of the remittitur or file a petition for writ of habeas corpus.

On May 1, 2015, this court appointed new counsel "to review the record to determine whether additional pleadings should be filed on behalf of appellant Munoz." On July 28, 2015, new counsel timely filed this petition for writ of habeas corpus. On September 3, 2015, this court ordered the Department of Corrections and Rehabilitation to show cause why relief prayed for in the petition for writ of habeas corpus should not be granted. On October 29, 2015, the Attorney General filed a return and on November 10, 2015, Munoz's new counsel filed a traverse.

8

**Ineffective Assistance of Counsel**

Habeas corpus relief is available for a claim of ineffective assistance of appellate counsel. (See *In re Robbins* (1998) 18 Cal.4th 770, 810.) The standard applied to review of a claim of ineffective assistance of appellate counsel is the same as that applied to trial counsel. (*People v. Osband* (1996) 13 Cal.4th 622, 664; *In re Banks* (1971) 4 Cal.3d 337, 343; *In re Smith* (1970) 3 Cal.3d 192.) A defendant must establish that his "'counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and there is a reasonable probability that, but for counsel's unprofessional errors and/or omissions, [he would have obtained] a more favorable outcome.'" (*In re Cudjo* (1999) 20 Cal.4th 673, 687; *People v. Ledesma* (1987) 43 Cal.3d 171, 216.) The question raised here is whether Munoz would have obtained a more favorable result had Brownell challenged the trial court's responding instruction to the jury's inquiries on aider and abettor culpability for first degree murder.

### *Relevant Background*

The prosecution theory at trial was that Munoz aided and abetted the murder of Godoy. The trial court instructed that "[a] person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. Two, he or she may have aided and abetted someone else, who committed the crime. In these instructions, I will call that other person the 'perpetrator.' A person is equally guilty of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it." (CALCRIM No. 400.) The court further instructed that "[t]o prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] 1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator

intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] AND [¶] 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime. [¶] Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime." (CALCRIM No. 401.)

The trial court instructed that to prove Munoz is guilty of murder, "the People must prove that: [¶] 1. The defendant committed an act that caused the death of another person; [¶] AND [¶] 2. When the defendant acted, he had a state of mind called malice aforethought." (CALCRIM No. 520.) And if the jury "decide[s] that the defendant has committed murder, [the jury] must decide whether it is murder of the first or second degree. [¶] The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation. The defendant acted willfully if he intended to kill. The defendant acted deliberately if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with premeditation if he decided to kill before committing the act that caused death. [¶] . . . [¶] All other murders are of the second degree." (CALCRIM No. 521.) The jury was also instructed on the subject of voluntary intoxication as a legal basis for negating the elements of premeditation and deliberation. (CALCRIM No. 625 [the jury "may consider that evidence only in deciding whether the defendant acted with an intent to kill or the defendant acted with deliberation and premeditation"].)

The jury began deliberating on September 11, 2007, at 3:34 p.m., took an evening recess at 4:00 p.m., and then resumed deliberations the next day at 8:30 a.m. During the course of the day, the jury submitted written requests for copies of the transcript of Munoz's two interviews, a February and March 2006 calendar, and read back of two witnesses' testimony, along with more jury request forms.

10

At 3:35 p.m., the jury submitted a request stating, "1. Answer to this question: In determining degree, is phrase 'decided to kill' with respect to 'DELIBRATE' about perpetrator or abettor. 2. Do enhancements apply for second-degree [murder]." The court read the inquiry to counsel outside the presence of the jury. The court responded, "The answer to question number 2 will be yes." In responding to the jury's first question, the court cited the holding in *People v. Lee* (2003) 31 Cal.4th 613 (*Lee*) as standing for the proposition that first degree attempted murder must be "willful, deliberate and premeditated, but not that the attempted murderer personally have acted [with] willfulness, deliberation and premeditation even if he is guilty as an aider and abettor." Defense counsel pointed out that the *Lee* case dealt "specifically with attempted murder" and was "distinguishable from our case. I mean, we are talking about the charge of actual murder as an aider and abettor, not attempted murder." The court responded that there was no meaningful distinction between the language in section 664 defining willful, deliberate, and premeditated attempted murder, and the language in section 189 defining willful, deliberate, and premeditated murder. The court concluded that the holding in *Lee* would logically apply to a completed murder as well. The court indicated that it would instruct the jury that it need only find that willfulness, deliberation, and premeditation "applies to the perpetrator." Defense counsel requested more time to research the issue. The court denied the request and brought the jury into the courtroom.

The court instructed the jury that enhancements apply to second degree murder. As to the jury's first question, the court instructed, "In determining degree as the phrase, quote, 'decided to kill', quote, with respect to deliberate, quote, about the perpetrator or the abettor, it's about the perpetrator. [¶] Does that answer the jury's question?" The jury foreperson responded in the affirmative. The jury took an evening recess at 4:00 p.m., and resumed deliberations at 1:30 p.m. on September 13, 2007.

On September 13, 2007, at 1:53 p.m., the jury submitted its final request which stated, "We still need confirmation . . . Jury instruction states: 'The defendant is guilty of first degree murder if the People have proved that he acted . . .' [¶] In this case, [¶] Is

11

this 'he' the abettor, i.e., the defendant, or the perpetrator." The court read the inquiry outside the presence of the jury and discussed with counsel. The court reiterated its understanding that "he" referred to the perpetrator, not the aider and abettor. Defense counsel objected, argued that "he" referred to Munoz as the aider and abettor. "For the court to answer them in a way that's not technically true, that 'he' refers to the perpetrator, which it clearly doesn't in that instruction, is essentially for the court to instruct that they must come back with [murder in] the first [degree]." The court indicated it would instruct the jury that "under the law an aider and abettor need not personally have acted with willful [*sic*] deliberation and premeditation." Defense counsel contended that such an answer would not directly address the jury's inquiry. The prosecutor interjected that the court was correct, "The law is absolutely clear that in terms of willful, deliberate and premeditated, you are talking about the intent of the perpetrator."

The jury was brought into the courtroom and the court inquired of the jury foreperson to clarify their written request. The foreperson stated, "We are trying to figure out whose state of mind we should be assessing." The jurors were excused while the court further discussed the issue with counsel.

The court said that the language for first degree murder under section 189 and attempted murder under section 664 is "extremely similar, if not identical." The court concluded that *Lee* applied to murder and that it would instruct accordingly. Defense counsel objected to the court's instruction "because *Lee* does apply specifically to [section] 664 [subdivision] (a) and it limits its decision to attempted murder. It doesn't talk about murder." Defense counsel noted that the language in section 189 and section 664 is "similar, but it's not exactly the same." Defense counsel again voiced his staunch disagreement with the court's instruction before the jury was called back into the courtroom.

At 2:16 p.m., the court instructed the jury, "It is required for purposes of first degree murder that the murder be willful, deliberate and premeditated, not that the

12

murderer personally have acted with willfulness, deliberation and premeditation, even if he is guilty as an aider and abettor." The foreperson asked the court to repeat the instruction again before they were excused and resumed deliberations. About 30 minutes later, at 2:50 p.m., the jury reached a verdict. The jury found Munoz guilty of first degree murder.

On December 7, 2007, defense counsel filed a motion for new trial, contending in part that the trial court, over defense counsel's objection, erroneously adopted the reasoning in *Lee*, *supra*, 31 Cal.4th 613 and instructed the jury that it is the premeditation and deliberation of the actual shooter which is sufficient for Munoz's conviction of first degree murder. The court denied the motion, stating only that "[t]here was no error."

### *Aider and Abettor Culpability for First Degree Murder*

To determine whether Brownell's performance was deficient, it is necessary to consider the state of the law on aider and abettor culpability for first degree murder at the time of Munoz's direct appeal. The Attorney General and Munoz's new counsel disagree on the state of the law, in particular, the result of the California Supreme Court decision in *People v. McCoy* (2001) 25 Cal.4th 1111 (*McCoy*).

In *McCoy*, the California Supreme Court stated, "'All persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, . . . are principals in any crime so committed.' (Pen. Code, § 31; see *People v. Mendoza* (1998) 18 Cal.4th 1114, 1122-1123; *People v. Prettyman* (1996) 14 Cal.4th 248, 259-260.) Thus, a person who aids and abets a crime is guilty of that crime even if someone else committed some or all of the criminal acts. (*Ibid.*) Because aiders and abettors may be criminally liable for acts not their own, cases have described their liability as 'vicarious.' (E.g., *People v. Croy* (1985) 41 Cal.3d 1, 12, fn. 5.) This description is accurate as far as it goes. But, as we explain, the aider and abettor's guilt for the intended crime is not entirely vicarious. Rather, that guilt is based

13

on a combination of the direct perpetrator's acts and the aider and abettor's *own* acts and *own* mental state." (*McCoy*, *supra*, 25 Cal.4th at pp. 1116-1117.) "Aider and abettor liability is . . . vicarious only in the sense that the aider and abettor is liable for another's actions as well as that person's own actions." (*Id.* at p. 1118.) In contrast, an aider and abettor's "mental state is [his or] her own; [the aider and abettor] is liable for [his or] her mens rea, not the other person's [i.e., the direct perpetrator's mens rea]." (*Ibid.*) Because the mens rea of a direct perpetrator and an aider and abettor floats free from the other's mens rea, the level of guilt of one also floats free from the other's. (*Id.* at pp. 1118-1119.) Accordingly, *McCoy* held: "If the mens rea of the aider and abettor is more culpable than the actual perpetrator's, the aider and abettor may be guilty of a more serious crime than the actual perpetrator." (*Id.* at p. 1120.)

Under *McCoy's* reasoning, the degree of culpability of an aider and abettor in a murder prosecution is based on his or her own mental state, not that of the direct perpetrator. *McCoy* supports the proposition that a jury must find that an aider and abettor of a murder had the requisite mens rea of premeditation and deliberation in order to be culpable for first degree murder. Here, the trial court's instructions in response to the jury's request for clarification of the necessary mental state of an aider and abettor for first degree murder runs counter to the reasoning in *McCoy*. The trial court's responses did not direct the jury to examine Munoz's mens rea separately from that of the perpetrator. The court's instructions erroneously permitted Munoz to be convicted of first degree murder without a determination that he acted with premeditation and deliberation.

The Attorney General contends that the narrow issue in *McCoy* was whether an aider and abettor could be liable for a greater homicide-related offense than the actual perpetrator, not whether aiders and abettors could be culpable for different degrees of murder. Our Supreme Court understands *McCoy* to stand for a more expansive point: "[A] defendant charged with murder or attempted murder can be held vicariously liable for the actus reus of an accomplice, but, for murder, a defendant cannot be held

14

vicariously liable for the mens rea of an accomplice. (*McCoy*, *supra*, 25 Cal.4th at p. 1118.)" (*People v. Concha* (2009) 47 Cal.4th 653, 665.) Leaving no doubt as to how the court views its holding in *McCoy*, our Supreme Court also stated, "To satisfy the mens rea element of murder, the defendant must personally act with malice aforethought. (*McCoy*, *supra*, 25 Cal.4th at p. 1118.)" (*People v. Concha*, *supra*, at p. 660.) We are satisfied that *McCoy* stands for more than the narrow proposition that an aider and abettor may have different culpability than the perpetrator of a murder.

We also disagree with the Attorney General's argument that the holding in *McCoy* was clouded by the California Supreme Court's holding in *Lee*, *supra*, 31 Cal.4th at page 616, that section 664, subdivision (a), requires "only that the murder attempted was willful, deliberate, and premeditated, but not to require that an attempted murderer personally acted willfully and with deliberation and premeditation, even if he or she is guilty as an aider and abettor." The decision in *Lee* is clear that it applies to attempted murder. Defense counsel at trial had no problem advocating that Lee's analysis was limited to attempted murder and it had no application to murder. Between trial counsel's objections to the court reliance on the reasoning in *Lee*, the motion for new trial based on *Lee*, and the decision in *McCoy*, previous appellate counsel should have recognized that the court's instructions presented a strong appellate contention.

After new counsel was appointed by this court, Brownell provided a letter explaining why he did not argue this point on appeal. He stated that he read *McCoy* to mean "that the mental state required of an aider and abettor . . . as described in CALCRIM 401, is the only mental state necessary in order to convict an aider and abettor of a specific intent crime, including deliberate and premeditated murder. I was not aware of any case holding that, in order to convict, the jury must find that an aider and abettor independently harbors the specific intent which is an element of the crime, in addition to the mens rea required for aiding and abetting. For that reason, I did not feel that the judge's answers to the jury's questions lowered the prosecution's burden of proof as to Mr. Munoz's mental state." As previously discussed, this is an incorrect reading of

15

*McCoy*, which states that "the aider and abettor must know and share the murderous intent of the actual perpetrator." (*Id*. at p. 1118.) We conclude Munoz made a sufficient showing that appellate counsel's performance was deficient because his representation fell below an objective standard of reasonableness under prevailing professional norms. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688; *People v. Ledesma*, *supra*, 43 Cal.3d at pp. 217-218.)

### *Prejudice*

We further conclude that Brownell rendered prejudicial ineffective assistance in failing to challenge the trial court's responding instruction to the jury's inquiries on aider and abettor culpability for first degree murder.

Prejudice is shown when there is a "'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." [Citations.]' [Citation.] The United States Supreme Court recently explained that this second prong of the *Strickland* test is not solely one of outcome determination. Instead, the question is 'whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair.' (*Lockhart v. Fretwell* (1993) 506 U.S. 364, 372.)" (*In re Harris* (1993) 5 Cal.4th 813, 833.) Thus, an "inexcusable failure of appellate counsel to raise crucial assignments of error that arguably could have resulted in reversal deprived defendant of effective assistance of appellate counsel." (*Ibid.*, citing *In re Smith*, *supra*, 3 Cal.3d at p. 202.)

The trial court's failure to adequately answer the jury's inquiry "'is subject to the prejudice standard of *People v. Watson* [(1956)] 46 Cal.2d 818, 836,' i.e., whether the error resulted in a reasonable probability of a less favorable outcome. (*People v. Roberts* (1992) 2 Cal.4th 271, 326.) In this context, 'reasonable probability' means "'merely a *reasonable chance*, more than an *abstract possibility*," of an effect of this kind.' (*People*

*v. Blakeley* (2000) 23 Cal.4th 82, 99.)" (*People v. Eid* (2010) 187 Cal.App.4th 859, 882.) "A trial court's failure to instruct on all elements of an offense is a constitutional error 'subject to harmless error analysis under both the California and United States Constitutions.' (*People v. Flood* [(1998)] 18 Cal.4th [470,] 475.) Under the federal Constitution, the standard is whether the instructional error was harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18, 24. (*Flood*, [*supra*,] at p. 504.)" (*Id.* at p. 883.)

The trial court's erroneous instructional response to the jury's inquiry on aider and abettor liability for first degree murder was prejudicial under either the *Chapman* or *Watson* standard. "A jury's request for reinstruction or clarification should alert the trial judge that the jury has focused on what it believes are the critical issues in the case." (*People v. Thompkins* (1987) 195 Cal.App.3d 244, 250 (*Thompkins*).) In *Thompkins*, *supra*, at page 249, the jury notified the trial court that it was deadlocked and the court inquired whether it could assist in any way. The jury foreperson suggested that the court could clarify whether sudden heat of passion can nullify premeditation. (*Id.* at pp. 249-250.) The court provided a very short answer which was legally deficient, and it directed the jury to resume deliberations. (*Id.* at pp. 250-251.) The jury found the defendant guilty. In reversing the defendant's first degree murder and attempted murder convictions, the Court of Appeal found the trial court's response to the jury's inquiry prejudicial even though the prosecution argued there was strong evidence of premeditation. (*Id.* at pp. 251-252.) The *Thompkins* court reasoned that the jury had been deadlocked prior to the court's statement, meaning that "at least one of the jurors was not persuaded by the strength of the prosecution's evidence." (*Ibid.*)

Here, the jury was clearly focusing on what was required to establish Munoz's guilt for premeditated and deliberate murder as an aider and abettor. The jurors sought instructional clarification twice on whose mens rea they should be assessing in determining whether the murder was premeditated and deliberate—the shooter's as the direct perpetrator, or Munoz's as the aider and abettor. After receiving a response from

17

the court instructing that the jury must evaluate the mental state of the direct perpetrator and not the aider and abettor, the jury returned a verdict within 30 minutes. This scenario is sufficient to show prejudice, as it is clear the jury was considering both first and second degree murder, and chose the former only after receiving the court's erroneous clarification regarding the required mens rea. As the *Thompkins* court noted, "there is no category of instructional error more prejudicial than when a trial judge makes mistakes in responding to a jury's inquiry during deliberations." (*Id.* at pp. 252-253.) Additionally, the jury also asked the court in the very same jury request whether "enhancements apply for second degree murder," which is further evidence that the jury was considering second degree murder. Had the issue been raised on appeal, this court would likely have found that the judge's error was not harmless beyond a reasonable doubt. (See *People v. Nero* (2010) 181 Cal.App.4th 504, 518-519 [finding prejudice where court erroneously answered jury question about whether aider and abettor could be guilty of a lesser charge than the shooter, because the jury's questions made it clear it was considering whether to impose a lesser degree or offense on the aider and abettor, and the court's misinstruction precluded that result].) As such, there is a reasonable probability that Munoz would have achieved a different result if Brownell had raised the issue on appeal. (*People v. Loza* (2012) 207 Cal.App.4th 332, 350-351 [finding prejudicial ineffective assistance of counsel under "reasonable probability" standard where trial counsel did not object either to trial court's decision to instruct with CALCRIM No. 400 or the court's response to the jury's questions, failing to clarify that the jury was required to consider the aider and abettor's own intent in returning a first degree murder verdict].)[3]

---

[3] We are required by Business and Professions Code section 6086.7 to report our reversal of the judgment to the State Bar of California for investigation of the appropriateness of initiating disciplinary action against defendant's original appellate counsel. (*In re Sixto* (1989) 48 Cal.3d 1247, 1265, fn. 3.)

18

### *Second Degree Murder*

"When a greater offense must be reversed, but a lesser included offense could be affirmed, we give the prosecutor the option of retrying the greater offense, or accepting a reduction to the lesser offense. [Citation.]" (*People v. Kelly* (1992) 1 Cal.4th 495, 528.) The jury implicitly found the requisite mens rea necessary for second degree murder. The trial court instructed the jury on aiding and abetting liability, and also instructed on the malice requirement of murder. To the extent the jury based its verdict as to Munoz on his personal acts, it necessarily found malice. To the extent it based it on the shooter's act, finding that Munoz aided and abetted those acts, it necessarily found that Munoz knew of the shooter's unlawful purpose and intended to commit, encourage, or facilitate that purpose. (*McCoy*, *supra*, 25 Cal.4th at pp. 1122-1123; see *People v. Beeman* (1984) 35 Cal.3d 547, 560.) "The only unlawful purpose charged here was an unlawful killing. Absent some circumstances negating malice, one cannot knowingly and intentionally help another commit an unlawful killing without acting with malice. (See generally *People v. Whitfield* (1994) 7 Cal.4th 437, 450.)" (*McCoy*, *supra*, at p. 1123.) We conclude the jury made an implicit finding that Munoz knowingly and intentionally helped the shooter commit the crime, which constitutes malice. We therefore conditionally reverse Munoz's conviction for first degree murder. (See § 1260; *People v. Edwards* (1985) 39 Cal.3d 107, 118 ["'An appellate court is not restricted to the remedies of affirming or reversing a judgment. Where the prejudicial error goes only to the degree of the offense for which the defendant was convicted, the appellate court may reduce the conviction to a lesser degree and affirm the judgment as modified, thereby obviating the necessity for a retrial'"]; *People v. Sanchez* (2013) 221 Cal.App.4th 1012, 1028.)

**Timeliness**

The Attorney General contends that Munoz's petition for writ of habeas corpus is

19

untimely and should be denied on that basis. We disagree and conclude that the ineffective assistance of counsel on Munoz's prior appeal constitutes an adequate explanation for the delay.

A defendant seeking habeas corpus relief must file a petition "without substantial delay, or, if delayed, adequately explain the delay." (*In re Harris*, *supra*, 5 Cal.4th at p. 828.) The California Supreme Court observed that "[t]he manifest need for time limits on collateral attacks on criminal judgments . . . must be tempered with the knowledge that mistakes in the criminal justice system are sometimes made . . . . A writ of '[h]abeas corpus may thus provide an avenue of relief to those unjustly incarcerated when the normal method of relief-i.e., direct appeal-is inadequate' [citation] . . . ." (*In re Sanders* (1999) 21 Cal.4th 697, 703-704.) In *In re Clark* (1993) 5 Cal.4th 750, which involved successive habeas corpus petitions, the court stated that if "counsel failed to afford adequate representation in a prior habeas corpus application, that failure may be offered in explanation and justification of the need to file another petition." (*Id.* at p. 780.) The actions of prior counsel may constitute an adequate explanation for the delay in seeking habeas corpus relief. (See *In re Sanders*, *supra*, at p. 720.)

"[H]abeas corpus is preserved as an avenue of relief to those for whom the standard appellate system failed to operate properly." (*In re Harris*, *supra*, 5 Cal.4th at p. 828.) That is the case here: Due to the ineffective assistance of Brownell, the standard appellate system failed to operate properly for Munoz. Munoz was unaware of this failure and it only came to light when discovered by CAP after Munoz's inquiry regarding a California State Supreme Court decision decided only four months earlier. We hold that this failure constitutes an adequate explanation for Munoz's delay in filing his petition for writ of habeas corpus. The petition therefore is timely.

20

**DISPOSITION**

The petition for writ of habeas corpus is granted.  Munoz's conviction for first degree murder is reversed with the following directions:  If the People do not retry Munoz for first degree murder solely on the aiding and abetting theory within 60 days after the remittitur is filed or if the People file a written election not to retry Munoz, the trial court shall proceed as if the remittitur modified the judgment to reflect a conviction for second degree murder rather than for first degree murder and sentence Munoz accordingly.


KRIEGLER, J.


We concur:


MOSK, Acting P. J.


BAKER, J.