Filed 2/26/24  P. v. Ortiz CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>            v.<br><br>JOSE PANTOJA ORTIZ,<br><br>      Defendant and Appellant. | F085632<br><br>(Super. Ct. No. VCF392615)<br><br>**OPINION** |

-----

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Tulare County.  Nathan G. Leedy, Judge.

Patricia L. Brisbois, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Darren K. Indermill and Catherine Tennant Nieto, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

-----

[*]      Before Detjen, Acting P. J., Franson, J. and Snauffer, J.

## INTRODUCTION

Defendant Jose Pantoja Ortiz contends that he received ineffective assistance of counsel because his defense counsel failed to introduce expert testimony on the effects of alcohol on his ability to form the specific intent required to commit rape and sexual penetration by impersonation. We reject defendant's claim and affirm the judgment.

## PROCEDURAL SUMMARY

Defendant was charged with rape by impersonation (Pen. Code, § 261, subd. (a)(5);[1] count 1) and sexual penetration by impersonation (§ 289, subd. (f); count 2). A jury found defendant guilty of both counts. Defendant was sentenced to the lower term of three years in state prison for each count, to be served concurrently.

## FACTUAL SUMMARY

### I.     Prosecution Evidence

F.O. and defendant are brothers. On November 15, 2019, F.O. had his two brothers and their families over for a large dinner and to drink beer. F.O. and defendant started drinking around 5:00 p.m. or 6:00 p.m. At the end of the night, all the guests left except defendant. F.O. and defendant continued drinking in the garage and F.O.'s wife, G.E., went to sleep in her own bed in the master bedroom around 2:00 a.m. or 3:00 a.m. F.O. estimated that he drank about 20 to 24 beers that night but did not think he was drunk and was always conscious about what was going on. F.O. stated that he and defendant often drank that much alcohol and did not know how much defendant drank that night. G.E. was unable to recall how much beer everyone drank but said that there was a lot of beer there. Defendant also wanted to leave, so to prevent him from driving, F.O. took away defendant's keys and had defendant sleep with him in his son's room.

---

[1]     Hereinafter, undesignated statutory references are to the Penal Code.

Around 4:00 a.m. or 5:00 a.m., G.E. felt somebody get close to her in bed and touch her. G.E. assumed it was her husband, F.O. Defendant touched G.E.'s buttocks and vagina. Then defendant positioned himself on top of G.E. and removed her clothes. G.E. could not see defendant because it was dark and she believed he was her husband. Defendant kissed her and also placed his mouth on her chest and started penetrating her vagina with his penis. G.E. said she detected a whiff of alcohol on his breath.

At some point G.E. noticed she was being touched differently than the way her husband normally touched her. G.E. tried to get defendant off of her but she could not because he had his hands over her hands. G.E. said, " 'Paco, did you put your condom on?' " because she and her husband were using protection at that time, but he did not respond. G.E. explained that she calls her husband "Paco." She asked him again, calling him Paco, but he did not respond. G.E. went into the bathroom when it was over and turned on the light. Defendant was lying in the bed with the blanket pulled up to his eyes. G.E. walked over to ask him why he did not use protection. When defendant removed the blanket from his face, G.E. saw that it was defendant and not her husband in the bed. G.E. said, " 'What are you doing in my bed?' " and that he "maybe just smirked" in response. G.E. got a blanket and covered herself and locked herself in the bathroom for about 20 minutes. She cried and could not believe what had happened to her. When G.E. came out of the bathroom, defendant was gone.

G.E. woke up F.O. around 6:00 a.m. or 7:00 a.m. and told him everything that just happened. They looked for defendant but he was gone. Defendant's phone was located in their son's bedroom.

After hearing about what defendant had done, F.O. decided it was best to call the police. The police arrived between 7:00 a.m. and 8:00 a.m. G.E. was taken to a clinic where she underwent a sexual assault exam and testing.

G.E. and F.O. had been married for 19 years. G.E. had a good relationship with defendant, and defendant's wife was her best friend. G.E. had never had any inclination

to have sex with defendant and defendant had never shown any sexual interest in her before this incident. G.E. testified that she did not consent to being touched by defendant or having sex with defendant. She would not have had sex with him if she had known it was defendant.

Officer Lucas Valverde responded to the incident and spoke with F.O., G.E., and their daughter, A.E. A.E. told Valverde about an incident that occurred about a month earlier when defendant had touched her. At the time, A.E. was sleeping in a bed with defendant's daughter when defendant entered the bedroom, which caused her to wake up. Defendant started touching A.E. over her clothes, and then touched her bottom underneath her clothes. A.E. was afraid and froze because she did not know what to do. When defendant started reaching towards her vagina, she took his hand and moved it away. She kept her eyes closed, but heard defendant get up and leave. A.E. did not tell anyone about the incident because defendant was her dad's brother, and she wanted to protect her dad from pain. A.E. explained she was processing what happened because she saw defendant as a father figure but disclosed this incident after she heard about what he had done to her mom.

Sergeant Henry Martinez also spoke with G.E. and A.E. Martinez scheduled the sexual assault exam for G.E. Martinez then interviewed defendant at the Visalia Police Department. After reading defendant his *Miranda* rights, Martinez noticed the smell of alcohol on his breath. Defendant did not appear impaired because he was not slurring his words or stumbling or swaying. Typically, when someone has consumed alcohol the night before, they will have the odor of alcohol the next day. Martinez administered a breathalyzer test on defendant to confirm that defendant was not intoxicated and understood all the questions he was asked. Defendant had a breath-alcohol content of 0.09 percent. On cross-examination, Martinez agreed that at a certain point after drinking, the breath-alcohol content starts to drop. Martinez did not ask defendant when his last drink of alcohol was. Martinez testified that depending on the person and amount

4.

of alcohol, it is possible that consumption of alcohol could affect his or her memory. If a person consumed between 18 and 24 beers, Martinez said it was possible, depending on a person's alcohol tolerance, the type of person, and what type of alcohol they drank, that someone's memory could be affected.

Defendant told Martinez that he and his family had been drinking at F.O.'s house the night before and that he knew that at some point his family left. Defendant said that his other brother left first, followed by defendant's wife and kids. After defendant's family left, he and F.O. continued drinking in the garage. Defendant said that he and F.O. eventually went to sleep in a bedroom. He admitted that he got up and left that bedroom and went into G.E.'s bedroom. Defendant did not have an explanation for why he went into G.E.'s bedroom but said that he was not thinking. Defendant admitted that he got into the bed and started kissing G.E., touched G.E. on her vagina, and then inserted his penis into her. He told Martinez that G.E. found out it was him when she turned on a light and she was surprised. G.E. asked defendant what he was doing there and told him to get out. Defendant was placed under arrest.

At trial, Martinez noted defendant was emotional, expressed remorse, and acknowledged that what he had done was wrong. Defendant admitted that G.E. had never indicated to him that she wanted some kind of sexual relationship before and that he and G.E. had never had sex before. Defendant also admitted that he did not use a condom. Defendant did not tell Martinez that he had drunk so much alcohol that he did not know it was G.E. in the bed. Nor did he say he drank so much that he thought G.E. was his wife.

## II.    Defense Evidence

Defendant's wife, O.M., testified that on the night of the incident, she and defendant and their children went to F.O.'s house to eat dinner and drink. They brought a 24-pack of beer with them. O.M. and defendant were very close with F.O. and G.E.

5.

They got together to hang out and drink two to three times a month and would rotate between their houses. When O.M. and defendant would drink at F.O.'s house, they would stay the night and sleep in F.O.'s room and when they drank at O.M.'s place, she had F.O. and G.E. sleep in their room.

On the night of the incident, O.M. did not know how much beer was there, or how much defendant drank, but said it was a lot. Everyone had been drinking several beers. O.M. testified that the brothers were having a good time and seemed to be drunk. O.M. felt the effects of the alcohol she had consumed around 11:40 p.m. that night. This caused O.M. to feel like she needed to throw up so O.M.'s daughter-in-law drove her and her daughter home. O.M. said that when she left, she did not say goodbye to anybody. She went home, threw up, and went to sleep. Around 6:20 a.m. to 6:40 a.m., she was woken up by the phone ringing. F.O. called because he was trying to find defendant. While O.M. was on the phone with F.O., defendant came home. She got off the phone and asked defendant about what was going on. They spoke for about 15 minutes and then defendant left.

## DISCUSSION

### I.    Defendant's Trial Counsel Did Not Render Ineffective Assistance of Counsel by Failing to Introduce Expert Testimony on Effects of Intoxication.

Defendant claims that his trial counsel's failure to present expert testimony regarding the effects of alcohol intoxication to negate the specific intent element was prejudicial ineffective assistance of counsel. The People argue that defendant failed to identify the exculpatory evidence an expert would present and, as a result, fails to show his counsel's performance fell below an objective standard of reasonableness or that he was prejudiced. We agree with the People and reject defendant's claim.

#### A.    Relevant Factual and Procedural Background

During Martinez's testimony, he explained that he chose to administer a breathalyzer test to defendant because he had just spoken with him and wanted to confirm

6.

that defendant was not intoxicated and understood what he was saying. The breathalyzer test showed that defendant had a blood-alcohol level of 0.09 percent at the time he was interviewed, which was several hours after the incident. Martinez explained that in his experience, he knows that at a certain point after a person stops drinking, his or her breath blood-alcohol level starts to drop. Martinez did not ask defendant when his last drink of alcohol was.

Defense counsel cross-examined Martinez regarding his opinion on the effect alcohol has on memory as follows:

> "[Defense counsel]: In your opinion, in your experience, does a person's consumption of alcohol affect their memory?
>
> "[Martinez]: Depending on the amount and specific person. It's possible.
>
> "[Defense counsel]: If I were to give you a number, let's say a person consumed 18 to 24 beers in the course of a night of drinking, would that be sufficient to constitute someone who could—the memory be affected?
>
> "[Prosecutor]: Objection, calls for speculation.
>
> "[Court]: I think that's within the realm of ordinary experience to render a judgment on that type of question. [¶] If you have—if you feel like you're qualified to answer it, you can go ahead.
>
> "[Martinez]: It's possible. Like I said, it depends on the alcohol tolerance, the type of person and what type of alcohol. It's possible."

The court gave the jury the following instructions:

> "The following crimes require a specific intent or mental state: Rape by impersonation as charged in [c]ount 1 and sexual penetration by impersonation as charged in [c]ount 2. [¶] The following lesser included crimes also require specific intent or mental state: Attempts to commit the crimes charged in [c]ounts 1 and 2. [¶] For you to find a person guilty of these crimes, that person must not only intentionally commit the prohibited act but must do so with a specific intent or mental state. The act and the specific intent or mental state required are explained in the instructions for those crimes.

7.

"The defendant is charged in [count] 1 with rape by fraud in violation of [section] 261(a)(5). [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] Number one, the defendant had sexual intercourse with a woman; [¶] Number two, the defendant and the woman were not married to each other at the time of the sexual intercourse; [¶] Number three, the woman submitted to the intercourse because she believed the defendant was someone she knew, other than the defendant; [¶] And, number four, the defendant tricked her, lied to her, used an artifice or pretense or concealed information from her intending to make her believe he was someone she knew while intending to hide his own identity. [¶] … [¶]

"The defendant is charged in [count] 2 with sexual penetration by fraud in violation of [section] 289(f). [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] Number one, the defendant committed an act of sexual penetration with another person; [¶] Number two, at the time of the act, the defendant and the other person were not married to each other; [¶] Number three, the penetration was accomplished by using a foreign object; [¶] Number four, the other person submitted to the act because she believed that the person committing the act was someone she knew, other than the defendant; [¶] And, [n]umber five, the defendant tricked, lied, used an artifice, pretense or concealed information intending to make the other person believe she was someone she [knew] while intending to hide his own identity. [¶] … [¶]

"You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with the specific intent or mental state required for the charged crimes in [c]ount 1, rape by impersonation, and [c]ount 2, sexual penetration by impersonation, as well as the lesser included offenses of attempted rape by impersonation and attempted sexual penetration by impersonation. [¶] A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drug, drink or other substance knowing that it could produce an intoxicating effect or willingly assuming the risk of that effect.

"In connection with the charged crimes in [c]ount 1, rape by impersonation, and [c]ount 2, sexual penetration by impersonation, as well as the lesser included offense of attempted rape by impersonation and attempted sexual penetration by impersonation, the People have the burden of proving beyond a reasonable doubt that the defendant acted with the specific intent or mental state necessary for those crimes. If the People

8.

have not met this burden, you must find the defendant not guilty of the charged offenses."

During closing argument, defense counsel claimed it was lucky defendant got home without hitting someone, since four hours after driving to his home, his blood-alcohol level was still 0.09 percent. Defense counsel argued that it was reasonable that, for most people, a heavy night of drinking would affect their memory and open them up to making mistakes. Defense counsel further argued that G.E. would have known the difference between her husband and defendant in bed, and there was no evidence defendant intentionally tried to trick G.E. into thinking he was her husband. Defense counsel reminded the jury that they were allowed to consider defendant's level of intoxication when evaluating defendant's mental state to commit the crimes, which he proposed showed defendant was unable to form the specific intent to trick G.E.

During rebuttal, the prosecution reminded the jury that they had no evidence about how much defendant drank that night. The evidence shows that defendant went to sleep with F.O. in another room, he knew his wife had left, and he knew G.E. was in the other room. Defendant got up and went into the room where G.E. was sleeping, and when she called him her husband's nickname twice, he intentionally did not respond.

## B. Applicable Law and Standard of Review

A defendant claiming ineffective assistance of counsel must satisfy the two-part test of *Strickland* requiring a showing of counsel's deficient performance and prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) As to deficient performance, a defendant "must show that counsel's representation fell below an objective standard of reasonableness" measured against "prevailing professional norms." (*Id*. at p. 688.)

In evaluating trial counsel's actions, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance …." (*Strickland*, *supra*, 466 U.S. at p. 689; see *People v. Dennis* (1998)

9.

17 Cal.4th 468, 541.)  Thus, a defendant must overcome the presumption that the challenged action might be considered sound trial strategy under the circumstances. (*Strickland*, at p. 689; *Dennis*, at p. 541.)  "Reasonableness must be assessed through the likely perspective of counsel at the time."  (*People v. Ochoa* (1998) 19 Cal.4th 353, 445.)

The prejudice prong requires a defendant to establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  (*Strickland*, *supra*, 466 U.S. at p. 694.)  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  (*Ibid*.)

## C. Analysis

Defendant claims that his defense counsel's decision to not present expert testimony on the effects of alcohol intoxication was unreasonable and prejudicial. Defendant's primary defense to rape and sexual penetration by impersonation was that he was too intoxicated to form the specific intent to deliberately impersonate his brother in order to have sex with his brother's wife.  Defendant contends that his counsel should have presented evidence from an expert to aid the jury's understanding of how intoxicated he would have been at the time of the incident, since there was evidence defendant was too intoxicated to drive home and was still under the influence many hours later that day.

It is true that evidence of voluntary intoxication may be considered to negate specific intent and mental states.  (§ 29.4, subd. (b).)  However, defendant fails to overcome the strong presumption that his counsel's decision to not call an expert on intoxication was sound trial strategy under the circumstances prevailing at trial. (*Strickland*, *supra*, 466 U.S. at p. 689.)

"[C]ertain practical constraints make it more difficult to address ineffective assistance claims on direct appeal rather than in the context of a habeas corpus proceeding."  (*People v. Mickel* (2016) 2 Cal.5th 181, 198.)  "The record on appeal may

not explain why counsel chose to act as he or she did.  Under those circumstances, a reviewing court has no basis on which to determine whether counsel had a legitimate reason for making a particular decision, or whether counsel's actions or failure to take certain actions were objectively unreasonable." (*Ibid*.)  "[W]e begin with the presumption that counsel's actions fall within the broad range of reasonableness, and afford 'great deference to counsel's tactical decisions.' [Citation.]  Accordingly, [our Supreme Court] ha[s] characterized defendant's burden as 'difficult to carry on direct appeal,' as a reviewing court will reverse a conviction based on ineffective assistance of counsel on direct appeal only if there is affirmative evidence that counsel had ' " 'no rational tactical purpose' " ' for an action or omission." (*Mickel*, at p. 198; *People v. Stanley* (2006) 39 Cal.4th 913, 954 [There is a " 'strong presumption that counsel's conduct falls within the wide range of professional assistance' " and courts " 'accord great deference to counsel's tactical decisions.' "].)

In *Frierson*, our Supreme Court considered a claim of ineffective assistance of counsel on the grounds his trial counsel only used lay witnesses to establish a diminished capacity defense from the effect of drugs upon his physical and mental condition. (*People v. Frierson* (1979) 25 Cal.3d 142, 157.)  The court explained that evidence of trial counsel's inadequacy did not appear on the record on appeal. (*Id*. at pp. 157–158.)  At trial, two witnesses testified the defendant had taken Quaalude and angel dust (or PCP) on the day of the murder and that he appeared spaced out.  Neither witness testified extensively about the quantity or effect of the drugs upon the defendant's mental state and no expert witness was called to express any opinion on the matter.[2]  (*Id*. at p. 159.)

---

[2]     "[A]lthough counsel's inadequacy does not appear on the face of the record on appeal, certain uncontradicted facts described in the pleadings in the habeas corpus proceedings support defendant's contention and require[d] reversal." (*Frierson*, *supra*, 25 Cal.3d at pp. 157–158.)  Defendant's reliance on the habeas corpus proceedings in *Frierson* and *In re Sixto* (1989) 48 Cal.3d 1247 is not relevant to our analysis under appellate review.  Both habeas proceedings were decided by evidence received outside

11.

The appellate record before us is very similar:  witnesses observed defendant drinking, having a good time, and getting drunk.  There is no evidence about how much defendant drank or his level of intoxication at the time of the incident.  Nor is there any testimony that defendant appeared intoxicated after the incident, other than the breathalyzer test result of 0.09 percent breath alcohol, with no evidence in the record of what time it was administered.  The record offers no indication of what exculpatory evidence an expert would provide, which is critical to defendant's claim.

As explained by our Supreme Court in *People v. Bolin* (1998) 18 Cal.4th 297 (*Bolin*), where "[t]he record does not establish defense experts would have provided exculpatory evidence if called," the courts decline to speculate as to what an expert would say and consistently reject ineffective assistance of counsel claims on this basis. (*Id*. at p. 334.)  In *Bolin*, the defendant claimed that his counsel should have been more aggressive in his cross-examination of the prosecutor's expert and should have called its own expert to counter the ballistics and blood spatter evidence.  (*Ibid*.)  The defendant failed to identify " 'exculpatory or impeachment evidence that counsel could have revealed by further questioning of prosecution witnesses [or examination of defense experts] and that would have produced a more favorable result at trial.' "  (*Ibid*.)  " 'Such claims must be supported by declarations or other proffered testimony establishing both the substance of the omitted evidence and its likelihood for exonerating the accused.' " (*Ibid*.)  The court could not " 'evaluate alleged deficiencies in counsel's representation solely on defendant's unsubstantiated speculation.' "  (*Bolin*, at p. 334; *People v. Cox* (1991) 53 Cal.3d 618, 662, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Mitcham* (1992) 1 Cal.4th 1027, 1059.)

---

the record, such as declarations from experts and attorneys.  On appeal, we are limited to the four corners of the record.  (*People v. Waidla* (2000) 22 Cal.4th 690, 743 [" 'Appellate jurisdiction is limited to the four corners of the record on appeal .…' "].)

12.

The record in this case similarly fails to establish that an expert would have provided exculpatory evidence or that such testimony would have produced a more favorable result. (*Bolin*, *supra*, 18 Cal.4th at p. 334.) Although defendant argues that an expert would have explained retrograde extrapolation, the effect of intoxication on a person's mental state, and how alcohol is absorbed over time, the record is void of evidence from which an expert could use to extrapolate defendant's alcohol level at the time of the incident. There is no evidence regarding how much alcohol defendant drank, other than a lot, or how intoxicated he was at the time of the incident. We know that defendant had a blood-alcohol level of 0.09 percent hours later that day, but there was no evidence regarding how much defendant drank, when he stopped drinking, or even what time the breathalyzer test was given.[3] Defendant does not identify what, if any, exculpatory evidence would have been revealed by the production of a defense expert. Without an offer of proof, and a record lacking details, defendant's claims regarding what an expert could have said are only speculation, which we cannot consider. (See *Bolin*, *supra*, 18 Cal.4th at p. 334 [" 'We cannot evaluate alleged deficiencies in counsel's representation solely on defendant's unsubstantiated speculation.' "]; *People v. Waidla*, *supra*, 22 Cal.4th at p. 735 [" '[S]peculation is not evidence ….' "].)

Nor does the record reflect trial counsel's reasons behind his decision to not offer expert testimony. On direct appeal, when no explanation for counsel's conduct can be found in the record, "we must reject the claim [of ineffective assistance of counsel] unless counsel was asked for and failed to provide a satisfactory explanation, or there simply can be no satisfactory explanation." (*People v. Scott* (1997) 15 Cal.4th 1188, 1212; see *People v. Hernandez* (2004) 33 Cal.4th 1040, 1053.) Here, the record does not reveal defense counsel's reason for not offering expert testimony on the effects of alcohol

---

**3** Although defense counsel argued during opening and closing statements that the breathalyzer test was given at 10:30 a.m., there is no testimony or evidence in the record regarding the time the test was administered.

on mental states. It is possible that defense counsel did not feel an expert was necessary since there was witness testimony of defendant's intoxication and most people have personal experience with drinking and its effect on memory. The evidence shows that defendant drank a lot of beer and was drunk, F.O. drank as much as 24 cans of beer, and defendant's level of intoxication was at the point that F.O. did not let defendant drive home. Later that day, defendant's blood-alcohol level was still 0.09 percent. It is also possible defense counsel had reason to believe that because defendant regularly drank a lot of alcohol and did not appear intoxicated at 0.09 percent breath alcohol, an expert would have opined that his mental state was not as affected by drinking that much beer. To examine defendant's ineffective assistance of counsel claim on this record asks us to speculate as to the reasons counsel chose not to offer an expert, which we are prohibited from doing. (*People v. Diaz* (1992) 3 Cal.4th 495, 557 ["To engage in … speculations [about counsel's failure to act] would involve the reviewing court ' "in the perilous process of second-guessing." ' "].)

Defendant misstates *People v. Nunn* (1996) 50 Cal.App.4th 1357 when he argues his counsel's conduct was unreasonable because "[a] defense of voluntary intoxication *requires* expert testimony to aid the jury's understanding about the affect intoxication may have on [the defendant's] actual ability to form the specific intent." (*Id*. at p. 1365 (italics added).) In *Nunn*, the court considered the language of sections 28 and 29 and concluded expert psychiatric testimony was allowed to give opinion related to required mental states and intent, but that such experts could not offer conclusions that the defendant acted impulsively without the requisite mental state. (*Ibid*.) Of significance here, the court in *Nunn* did not state that expert testimony was *required* as defendant suggests.

Defendant's reliance on *People v. Williams* (1988) 45 Cal.3d 1268[4] to support his argument that "in addition to testimony about the amount of alcohol a defendant had consumed, expert testimony was necessary to explain the effect alcohol intoxication has on a person's cognitive function as it relates to specific intent because this is not something within the jurors' common knowledge" is misplaced. (*Id.* at pp. 1311–1312.) The *Williams* opinion does not state that expert testimony is necessary to explain the effect of alcohol intoxication as it relates to specific intent, nor does it even address ineffective assistance of counsel regarding the failure to call an expert. Rather, the issue before the court was whether the trial court erred by refusing to give the defendant's requested instructions on voluntary intoxication. (*Id.* at p. 1311.) The court rejected the defendant's claim based on the lack of evidence, " 'expert or otherwise,' " regarding the intoxicating effect, if any, that an undetermined amount of LSD may have had on his ability to form the necessary intent to rob or kill. (*Id.* at pp. 1311–1312.) As such, *Williams* is not instructive here.

Last, defendant fails to demonstrate prejudice, or that he would have received a more favorable judgment had his attorney called an expert to testify regarding the effect intoxication has on mental states. As discussed, defendant has not presented any evidence of what an expert would say regarding defendant's level of intoxication at the time of the incident and whether his level of intoxication would affect his memory and ability to form the requisite specific intent. Defendant's failure to set forth the substance of the expert's testimony in this regard is fatal to his claim. (See *People v. Medina* (1995) 11 Cal.4th 694, 773 [on direct appeal, "a claim of ineffective counsel cannot be established by mere speculation regarding the 'likely' testimony of potentially available witnesses"].) As such, he fails to demonstrate that the expert's evidence "might have caused a reasonable jury to conclude that the defendant actually lacked the mental

---

[4] Abrogated on another ground in *People v. Diaz* (2015) 60 Cal.4th 1176, 1190.

capacity that constituted an element of the charged offense." (See *In re Sixto*, *supra*, 48 Cal.3d at p. 1257.)

Consequently, since defendant fails to meet his burden of showing his counsel's performance was deficient or that he was prejudiced, his ineffective assistance of counsel claim fails. (See *Strickland*, *supra*, 466 U.S. at p. 687.)

## DISPOSITION

We affirm the judgment.